R. A. BELHUMEUR and Joan Belhumeur, F. J. Petkevich, Robert Casey, Samuel Winn and William J. Pearce, Plaintiffs,

v.

J. Paul DAWSON, Henry Simon, Mike Burch, E. O. Blakeway, Lee Thompson, individually and as members of a partnership known as "Musad", and William A. Davis, Defendants.

Civ. No. 2215.

United States District Court
D. Montana,
Great Falls Division.
May 1, 1964.

John M. McCarvel, Great Falls, Mont., and Wiggenhorn, Hutton, Schiltz & Sheehy, Billings, Mont., for plaintiffs.

E. K. Cheadle, Billings, Mont., for defendant J. Paul Dawson.

Lamey, Crowley, Kilbourne, Haughey & Hanson, Billings, Mont., for defendants Henry Simon, Mike Burch, E. O. Blakeway and Lee Thompson.

JAMESON, District Judge.

This is an action to recover monies which plaintiffs claim to have invested in a "security" offered and sold by the defendants in violation of the Securities and Exchange Act of 1933, as amended, 15 U.S.C.A. § 77a et seq. The jury returned verdicts in favor of the plaintiffs against the defendants Dawson, Blakeway and Davis, and in favor of the defendants Simon, Burch and Thompson. The plaintiffs and the defendants Blakeway and Dawson have moved for judgments notwithstanding the verdicts or for a new trial.[1]

Two primary questions are presented: (1) whether a "security" was involved within the meaning of the Securities and Exchange Act; and (2) whether there is evidence to support the respective verdicts.

Both the court and counsel found it difficult to phrase understandable instructions, both with respect to the definition of a security and the effect of various provisions of the Act. Although both the pretrial order and order for

---

1. Neither the defendant Dawson nor the defendant Davis was present for the trial, and Davis was not represented by counsel. At the close of all the evidence all of the parties, except Davis, moved for directed verdicts.

trial required the parties to submit requests for special interrogatories at or before the time required for filing requested instructions, none of the parties did so. Answers to special interrogatories might well have eliminated some of the speculation regarding the basis of the jury's general verdicts.

The defendants Simon, Burch, Blakeway and Thompson were residents of Texas and throughout the litigation have been referred to as the Texas defendants. The defendant Dawson was formerly a resident of Montana, but at the time of trial resided in Texas. The plaintiff Winn was a resident of Idaho. The remaining plaintiffs and the defendant Davis were residents of Montana.

A partnership known as Musad of Dallas was engaged in the sale and distribution of background music. All of the Texas defendants testified that this partnership was composed of Blakeway and Thompson, and their testimony was corroborated by documentary evidence.[2] They testified further that Burch was an employee of the partnership; that Simon was its attorney; and that Dawson was not at any time a member of the partnership.

Prior to August 10, 1960, Musad of Dallas had acquired the right to manufacture and market an audio-analgesic unit, referred to as "Audione". Dawson, who was in the background music business in Billings, Montana, and who had business contacts with Musad of Dallas, became acquainted with the Audione unit. As a result of negotiations between Dawson and Blakeway, apparently conducted on August 12, 1960, Simon prepared a contract (an office copy of which was received as plaintiffs' exhibit 1) whereby Musad of Dallas granted to Western Securities Corporation, a Montana corporation engaged in the marketing of securities, a franchise for the manufacturing and marketing of Audione in a seven state area. Western Securities Corporation was to organize a corporation, to be known as Electronics Research Laboratories, Inc., which would manufacture and distribute Audione. Musad of Dallas was to receive 35 per cent of the stock in Electronics Research Laboratories, Inc. (E.R.L.) and was to receive certain percentage cuts on the purchase of parts, etc.

This contract, together with a cover letter, (Ex. 55) was mailed by Simon to Dawson in Billings, on August 15, 1960. Dawson turned the contract over to defendant Davis, who was connected with Western Securities Corporation. Davis took the contract to an attorney who redrafted it, substituting the name of Davis for Western Securities Corporation and identifying the members of Musad of Dallas as the four Texas Defendants and Dawson.[3] (The contract as redrafted is plaintiffs' exhibit 2).

On August 24, 1960, Dawson, who was then in Billings, placed a conference call to Simon and Blakeway in Texas. He informed them of the substitution of Davis for Western Securities Corporation and of other changes. Simon and Blakeway testified that Dawson did not tell them that the four Texas Defendants and Dawson were shown as partners in Musad of Dallas.[4] Dawson asked whether it "would be all right for us to sign it (the

2. In the income tax returns filed by Musad of Dallas for 1960 and 1961, Blakeway and Thompson are listed as the partners. (Ex. 49 and 50).

3. The original draft of the contract referred to "Musad of Dallas, a partnership with its principal offices in the City of Dallas, Dallas County, Texas, hereafter for convenience referred to as 'Musad'". In the revised draft, following the words "Dallas County Texas", these words were inserted: "consisting of J. Paul Dawson, Henry Simon, Mike Burch, E. O.

Blakeway and Lee Thompson, being all of the members of the aforesaid partnership".

4. There is no substantial evidence to the contrary. Dawson did not testify at the trial; nor was his deposition taken. Simon and Blakeway testified further that they had not seen the contract as redrafted and did not know the Texas defendants and Dawson were named therein as partners until so informed by Pearce and Belhumeur in Chicago in February, 1961.

contract) up here", or words to that effect. Blakeway consented to the changes and said to go ahead and sign it. He testified that he thought Davis would sign the contract and forward it to him for signature on the part of Musad of Dallas. Although Davis signed the contract, none of the Texas defendants ever signed it. Dawson's signature appears as a "General Partner" of Musad, however, and apparently the plaintiffs were under the impression that Dawson was a partner in Musad.

Dawson and Davis first approached plaintiff Pearce in August, 1960. They had with them the original unsigned contract (Ex. 1). An employee of Musad demonstrated the Audione machine at a meeting in the Rainbow Hotel in Great Falls, Montana. Subsequently, Dr. Belhumeur and one or two others tried out the machine.

On September 1, 1960, Dawson and Davis again approached Pearce. By that time they had the contract signed by Dawson and Davis. (Ex. 2). Following another meeting, Pearce gave Davis a $5000 check for 5,000 shares of E.R.L. stock, and Davis gave Pearce a receipt (Ex. 3). Shortly thereafter, Pearce, Dr. Belhumeur, and Davis incorporated E.R. L. Pearce acted as president and Belhumeur as secretary.[5] Pearce testified that Dawson was to be the general sales manager and run the offices, to be located in Billings.

Other meetings were held at Dr. Belhumeur's home and other places. The machine was demonstrated at dental association meetings, including one at Sun Valley, Idaho, in which Pearce and Belhumeur participated. As a result of these meetings and demonstrations, the remainder of the plaintiffs invested in E.R.L. stock.

There was no solicitation of any investor by any of the Texas defendants. Dawson and Davis promoted the sale of the stock, with assistance from Pearce and Belhumeur.

With this background, we turn to the question of whether plaintiffs invested in a "security" within the meaning of the Securities and Exchange Act. Plaintiffs contend that they invested in an "investment contract". The Act provides in section 77b(1) that, "The term 'security' means any * * * investment contract * * *". Section 77e provides in part that:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interestate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

It is admitted that no registration statement was in effect.

There is of course no question that the E.R.L. stock is a security. Is there evidence of an "investment contract"? This is a nebulous term, difficult of definition and even more difficult of application. Plaintiffs contend that the *contract* between Davis and Musad, and the investments in the *stock of E.R.L.* are part of one inseparable transaction and together constitute an investment contract. Defendants contend that the franchise contract, exhibit 2, if it were ever effective (and this the Texas defendants deny, asserting Dawson had no authority to sign it), is nothing more than an asset of the corporation, and that the only security involved is the stock in E.R.L.

---

5. There was no formal meeting of the incorporators. Simon and Blakeway consented to act as directors, but there was never any meeting of the directors or of the incorporators for election of directors. Stock certificates and checks were signed by Pearce and Belhumeur as president and secretary respectively.

The instructions to the jury relative to the meaning of the word "security", after quoting from section 77b(1) supra, read:

"The shares of stock in Electronics Research Laboratories, Inc., are 'securities' under the Securities Act. The definition of 'security' under the Securities Act, however, is not limited to shares of stock and such commonly recognized forms of instruments. In a proper case, a 'security' may consist of a number of instruments and contracts.

"The term 'security' includes an investment contract. An investment contract means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promotor or a third party, it being immaterial whether the shares in the enterprise are represented by formal certificates or by some other instrument in writing representing an interest in the physical assets employed by the enterprise.

"In other words, the investors provide the capital and share in the earnings and profits; the promotors manage, control and operate the enterprise. Where the shares in the enterprise are not evidenced by certificates of stock or similar instruments, it is necessary that the investors have an interest in the property or assets of the enterprise and that they be entitled to share in the earnings and profits therefrom.

"If you find from a preponderance of the evidence that the plaintiffs purchased an interest in a common enterprise as herein defined whereby they were to share in the profits or earnings of that common enterprise, then you will find that the contract, if any, was an investment contract and a 'security'. On the other hand, if you find that the plaintiffs did not invest in a common enterprise as herein defined and were not entitled to share in its earnings and profits and looked only to the earnings and profits of Electronics Research Laboratories, Inc., for a return on their money, then the contract or series of contracts are not a 'security' within the meaning of the Securities Act." [6]

The foregoing instructions were predicated upon the definition of an investment contract in S. E. C. v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88, and S. E. C. v. W. J. Howey Co., 1946, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, rehearing denied 329 U.S. 819, 67 S.Ct. 27, 91 L.Ed. 697. Although the transactions involved in both of those cases were held to be investment contracts, the facts are distinguishable.

In Joiner, one Anthony had acquired oil and gas leases on about 4700 acres of land in consideration of drilling a test well. He assigned leases covering 3200 acres to the defendant Joiner Company upon Joiner's agreement to drill the well. Anthony, a driller, was to do the actual drilling and Joiner Company was to finance the drilling by reselling small parcels of assigned acreage, and to that end the company engaged in a campaign to sell assignments of the leases. The sales literature promised an exploration well and "emphasized the character of the purchases as an investment and participation in an enterprise". As the Court said, "The drilling of this well was not an unconnected or uncontrolled phenomenon to which salesmen pointed merely to show the possibilities of the offered

---

6. The Texas defendants excepted to these instructions on the ground that they would permit the jury to consider exhibits one and two as a security, when in fact the only security which could be considered "are the stock certificates in E. R. L.". Plaintiffs excepted to these instructions on the ground that "singling out Electronics Research Corporation and the stock therein as the only security that could be involved in this cause * * * is an incorrect statement of the law because the whole security involved here is a series of transactions arising from exhibit two". In effect the respective parties sought peremptory instructions.

leases. The exploration enterprise was woven into these leaseholds, in both an economic and a legal sense; the undertaking to drill a well runs through the whole transaction as the thread on which everybody's beads were strung. \* \* \*" 320 U.S. at 348, 64 S.Ct. at 122, 88 L.Ed. 88. In other words, the investors were participating in a common enterprise, the drilling of the well. "\* \* \* the purchaser was paying both for a lease and for a development project".[7]

In Howey, there was an offering of units of a citrus grove development coupled with a contract for cultivating, marketing, and remitting net proceeds to the investors. Holding that the land sales contracts, warranty deeds and service contracts constituted an investment contract, the Court said in part: "They (the respondent company) are offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents. \* \* \* Thus all the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profit; the promoters manage, control and operate the enterprise."

"\* \* \* The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."

In both Joiner and Howey investors acquired an interest in the common enterprise and shared "in the earnings and profits". The sales of the interests in the common enterprise were actually made by the defendant promoters, who also managed, controlled, and operated the joint enterprise.

It cannot be said here that the plaintiffs acquired any interest in Musad of Dallas or would share in its earnings and profits. Nor did Musad of Dallas or the Texas defendants participate in any sales to the plaintiffs. Nor was it contemplated that Musad of Dallas or the Texas defendants would manage, operate or control E.R.L.[8]

Here Musad of Dallas contracted with Davis to give him a franchise for the manufacture and sale of Audione.[9] Davis proceeded to organize a corporation to finance the venture. True, the plaintiffs assumed that the contract with Musad was properly executed and was in effect. They relied upon the fact that the corporation they were organizing would have the benefit of that contract. The investors, however, did not acquire any interest in the contract itself. They purchased stock in a corporation which owned the contract. They looked to the corporation, E.R.L., for a return on their investment—not to Musad or the Texas defendants. The corporation was the common enterprise. It was not managed, controlled, or operated by either Musad or the Texas defendants.[10]

There are many cases dealing with investment contracts. I have examined those cited by the respective parties, as well as other cases. The Joiner and Howey cases are the cornerstones for determining whether an investment contract is involved. No useful purpose would be

---

7. It is significant that Anthony was not joined as a defendant. There was no evidence that he participated in any sales to the investors. He was, however, a party to the contract whereby Joiner acquired an interest in the leases, both as assignor and as the driller of the test well.

8. The fact that Musad was to receive 35 per cent of the stock in E. R. L. and that it was contemplated that Simon, and Blakeway would constitute two of the five directors did not give Musad or the Texas defendants control of the corporation.

9. Musad of Dallas was also engaged in other enterprises.

10. The Contract recites that Davis is engaged in marketing securities; that he thinks securities of a corporation would be marketable; that he (Davis) is contemplating forming the corporation and selling shares of stock to raise working capital. By plaintiffs' own testimony, it was Davis and Dawson who did the promoting in Montana and who made the contacts with the plaintiffs.

served by a lengthy discussion of other cases.[11]

█ It is my conclusion that the plaintiffs have failed to establish an investment contract, and that the only security sold was stock in E.R.L. Since the Texas defendants had no connection with that stock, none of them may be found to be an "issuer", "underwriter"[12] or "dealer" within the meaning of sections 77d and 77e.

Next it must be determined whether one or more of the Texas defendants was a "controlling person" within the meaning of section 77o. This section imposes liability upon every person who controls any person liable under section 77l, "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist".

Under section 77l, liability is imposed for violation of section 77e, supra. The jury returned a verdict against the defendant Blakeway. If Dawson and Davis, or either of them, are liable under section 77e, then Blakeway would be liable if he were a "controlling person", as defined in section 77o; provided also that such control existed at or before the times of sale.[13]

█ There was extensive evidence with respect to events which transpired both before and after the sale of E.R.L. stock. I find no evidence to support a finding that Blakeway participated in any way in the sale of the stock to any of the plaintiffs, or exercised any control over Dawson and Davis in their sales of the stock.

Section 77q makes it unlawful for any person in the offer or sale of any security by use of interstate commerce or the mail to "employ any device, scheme, or artifice to defraud", or "to obtain money or property by means of any untrue statement of a material fact"; or "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser".

Blakeway did not participate in any fraud or misleading statements in connection with the sale of E.R.L. stock to the plaintiffs. There is no contention of fraud or misrepresentation on the part of Musad or the Texas defendants in entering into the contract with Davis. Plaintiffs of course knew that the corporation had the benefit of that contract. There is no evidence, however, that Musad would not have performed its obligations under that contract had Davis and E.R.L. been in a position to perform their respective obligations.[14]

11. See e. g., United States v. Schaefer, 7 Cir. 1962, 299 F.2d 625; Roe v. United States, 5 Cir. 1961, 287 F.2d 435; Blackwell v. Bentsen, 5 Cir. 1953, 203 F.2d 690; Penfield Co. of Calif. v. S. E. C., 9 Cir. 1944, 143 F.2d 746, and the many cases cited therein.

12. In defining the term "Issuer", the jury was instructed: "An issuer is any person, or corporation, which sells a security and the term 'issuer' includes persons who control a corporation. However, with respect to persons controlling corporations, it is necessary that such control existed at or before the time of the sale. Further, with respect to persons controlling corporations, they may be deemed issuers only with respect to transactions of an underwriter."

"The term 'underwriter' means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking."

13. Pearce gave the check for his stock on September 1, 1960. E. R. L. was incorporated by Pearce, Belhumeur and Davis on September 8. All of the stock certificates were signed by Pearce as President and Belhumeur as Secretary on September 26, 27, or 28. The check from Dr. Winn was dated September 26, payable to Dr. Belhumeur and endorsed by Belhumeur to E. R. L. The certificate was issued to Belhumeur and assigned by him to Winn.

14. The parties were unable to carry out the terms of the contract because of the failure of Davis to raise the money required by the contract to be placed in escrow.

Blakeway's motion for judgment notwithstanding the verdict must be granted. The motion of plaintiffs for a judgment notwithstanding the verdicts in favor of Simon, Burch and Thompson is denied.

The defendant Dawson has moved for a judgment notwithstanding the verdict on the grounds, inter alia, that (1) Dawson "was not an underwriter, issuer, or dealer" of a security under the provisions of section 77e; (2) any security which may have been sold was exempt by reason of having been offered only to Montana residents; (3) there is no proof of any interstate commerce or use of the mails; (4) Dawson may not be held as a "controlling person"; (5) there is no proof that he participated in any fraud; (6) plaintiffs are estopped by their own conduct; and (7) Belhumeur and Pearce participated in the sale of the stock in E.R.L.

The jury instructions defining the terms "issuer" and "underwriter" appear in footnote 12. The term "dealer" was defined in the instructions as follows:

"The term 'dealer' means any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person."

There is evidence that Dawson participated in the sale of E.R.L. stock. The jury could properly find that he was both an "underwriter" and "dealer" within the meaning of sections 77b(11) and (12).

■ Section 77c(a) (11) exempts a security "which is a part of an issue offered and sold only to persons resident within a single State", where the issuer is a corporation "incorporated by and doing business, within such State". The only sale made to a non-resident was the sale to plaintiff Winn, a resident of Ida-

ho. The Audione was demonstrated to Winn and others in Idaho. The stock purchased by Winn was issued to Belhumeur and by him endorsed to Winn, apparently for the purpose of circumventing an interstate sale. This procedure does not, however, establish a strictly intrastate offering and sale.

In S. E. C. v. Hillsborough Investment Corp., D.N.Hamp.1958, 173 F.Supp. 86, 88–89, the court said:

"The defendants argue that there were no sales to non-residents in cases where the securities were first issued to residents, who, after a thirty day waiting period, transferred them to non-residents. Such a procedure is in reality a sale to a non-resident. * * *

"In Stadia Oil & Uranium Co. v. Wheelis, 10 Cir. 1957, 251 F.2d 269, 275, sales of securities to residents, followed shortly thereafter by resales to non-residents, were held to be a circumvention of the law.

"It is accordingly concluded that, prior to the completion of ultimate distribution to security holders, any resale of securities by residents to non-residents, under an arrangement where the resident has no intention of holding for investment, but buys as a straw on behalf of a non-resident with a view to transfer to the non-resident in the near future, is a devious and futile attempt to acquire the exemptive benefits of section 3 (a) (11)."

(15 U.S.C.A. § 77c(a) (11) ).

The intrastate exemption, in my opinion, is inapplicable.

■ It is next contended that no violation of the Securities Act has been proven, since there was no use of the mails or of interstate commerce in connection with the offering and sale of the E.R.L. stock. The E.R.L. stock issued to Musad, however, was mailed to Dallas.[15]

15. Exhibit 9 is a stock certificate in Electronics Research Laboratories, Inc. for

108,500 shares issued to Musad of Dallas. It was sent by registered mail from Elec-

The fact that the use of the mails was between co-defendants is immaterial. While there is no evidence to show that Dawson personally placed this stock in the mails, he must be held for the acts done in furtherance of the corporation.

The use of mails for delivery of stock has been held sufficient to constitute a transaction within the Securities Act, even though the stock is purchased and paid for without any use of the mails. See Schillner v. H. Vaughan Clarke & Co., 2 Cir. 1943, 134 F.2d 875, 877; Blackwell v. Bentsen, 5 Cir. 1953, 203 F.2d 690, 693.[16]

■ We come now to the question of whether plaintiffs Belhumeur and Pearce are estopped from recovering against Dawson. The defense of estoppel is available in a Securities Act case. Straley v. Universal Uranium and Milling Corp., 9 Cir. 1961, 289 F.2d 370; Royal Air Properties Inc. v. Smith, 9 Cir. 1962, 312 F.2d 210.

What is necessary in order to establish estoppel? Section 93–1301–6, R.C.M. 1947, provides: "The following presumptions, and no others, are deemed conclusive:

" * * *

"3. Whenever a party has, by his own declaration, act, or omission, intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot, in any litigation arising out of such declaration, act, or omission, be permitted to falsify it."

In City of Billings v. Pierce Packing Co., 1945, 117 Mont. 255, 266, 161 P.2d 636, it was pointed out that subdivision 3 above is the statutory declaration of the doctrine of equitable estoppel.

The elements of estoppel were set forth in Mundt v. Mallon, 1938, 106 Mont. 242, 76 P.2d 326, where the court said:

" '1. There must be conduct—acts, language, or silence—amounting to a representation or a concealment of material facts. 2. These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him. 3. The truth concerning these facts must be unknown to the party claiming the benefit of the estoppel, at the time when it was acted upon by him. 4. The conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. 5. The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. 6. He must in fact act upon it in such a manner as to change his position for the worse; in other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct and to assert rights inconsistent with it.' Lindblom v. Employers' Liability Assurance Corp., supra." 106 Mont. at 249 and 250, 76 P.2d at 329.[17]

There is of course no question that Pearce and Belhumeur participated actively in the organization of E.R.L., and signed checks and stock certificates as officers of the corporation. Pearce signed

tronics Research Lab. Inc., Billings, Montana, to Musad of Dallas, Texas, (Ex. 10). The defendant Thompson signed the receipt as agent of Musad of Dallas (Ex. 51).

16. See also Moore v. Gorman, S.D.N.Y. 1948, 75 F.Supp. 453; Athas v. Day, D. Colo.1958, 161 F.Supp. 916; United States v. Steffes et. al., D.Mont., 1964, 226 F.Supp. 51.

17. While the doctrine of estoppel was expressed in more general terms in Levo v. Gen.-Shea-Morrison, 1955, 128 Mont. 570, 280 P.2d 1086, an action arising under the Workmen's Compensation Act, I do not find that the court has departed from the elements set forth in Mundt v. Mallon. See also Cedar Creek Oil & Gas Co. v. Fidelity Gas Co., 9 Cir. 1957, 249 F.2d 277, 281.

a progress report to the stockholders and the contract whereby Dawson was employed as manager. Belhumeur, in response to a request from Davis, wrote a letter praising the Audione machine. At Davis' suggestion, Belhumeur acted as the intermediary in the issuance of the stock to Winn.

■ While Pearce and Belhumeur participated actively in the affairs of E.R.L., there is no evidence that either of them concealed any material fact from Dawson; that Dawson relied and acted upon any conduct of either of them; or that by reason of their conduct, he changed his position for the worse. These essential elements of estoppel are lacking, and this defense accordingly is not available to Dawson.[18]

Dawson argues next that he cannot be liable because there was no public offering of the E.R.L. stock. Section 77d(1) states that the provisions of section 77e shall not apply to "transactions by an issuer not involving any public offering * * * *". It will be noted that the transactions exempted by section 77d relate only to liability under section 77e. Section 77c contains the broad classifications of excepted securities that apply to the Securities Act in general. In turn, however, the exemptions of section 77c do not apply to liability under 77q, for 77q(c) specifically so provides. Section 77q is the general fraud section of the Act.

■ There was evidence from which the jury could properly find that Dawson's conduct and representations to the plaintiffs were sufficient to establish liability under section 77q. Pearce testified that both Davis and Dawson made approaches to him which resulted in his investment; that he was told that about $50,000 had already been raised in Bill-

ings and that a last block of stock, about $25,000 worth, was all that was left; that it was at Dawson's request that he attended the dental association meeting in Sun Valley, where he helped display the Audione machine.

Dr. Belhumeur testified that Dawson's representations were primarily responsible for his investment; that Dawson told Belhumeur that he was a partner in Musad of Dallas and that Simon was also a partner; that when Belhumeur made his investment he was told by Dawson that $50,000 had already been raised. Dr. Petkovich testified that at the meeting at Dr. Belhumeur's home, Dawson said about $52,000 had already been raised of the $75,000 which was needed.

■ Dawson also argues that Dr. Winn should be estopped from recovering because, if there was any interstate sale of stock, as I have previously held there was, then Dr. Winn participated in making the sale possible. This overlooks the fact that it is not the interstate sale of securities that is condemned. It is such a sale where either fraud is involved or where no registration statement is in effect. It is the duty of the seller—not of the buyer—to avoid violating the Act.

The motion of J. Paul Dawson for judgment notwithstanding the verdict, or for a new trial, must be denied.

Plaintiffs have also moved to Amend Judgment pursuant to Rule 59(e), F.R. Civ.P. to allow interest to each plaintiff at the rate of 6% per annum from the date of the check representing each plaintiff's investment. Section 77l of the Securities Act provides for the recovery of the consideration paid for a security, with interest thereon, upon tender into court of the security. The motion is granted.

18. In view of my holding that the Texas defendants are not liable, it is unnecessary to decide whether Pearce and Belhumeur would be estopped from recovering from them.