COMMERCIAL IRON & METAL CO.,
Plaintiff-Appellant,

v.

BACHE & CO., INC., and Irving J.
Louis, Jr., Defendants-Appellees.

No. 72–1383.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted March 27, 1973.

Decided April 26, 1973.

Rehearing Denied May 22, 1973.

David G. Palmer, Denver, Colo. (Edwin S. Kahn and James C. Bull, Denver, Colo., on the brief), for plaintiff-appellant.

George H. Colin, New York City (Raymond J. Turner, Denver, Colo., on the brief), for defendants-appellees.

Before PICKETT, HILL and BARRETT, Circuit Judges.

HILL, Circuit Judge.

Appellant Commercial Iron & Metal Co. (Commercial) brought suit in Colorado federal district court to recover money damages against or rescind its contract with the metals department of Bache & Co., Inc. (Bache). Commercial is a limited partnership engaged in the metal and iron business in Denver, Colorado. Bache is a Wall Street corporation which, among other things, engaged in the metals business and has its principal place of business in New York City. Jurisdiction was invoked under diversity of citizenship, 28 U.S.C. § 1332, and the exclusive jurisdiction of federal courts over securities violations, 15 U.S.C. § 78aa. The trial court, after viewing the pleadings, affidavits and exhibits, granted Bache's motion for summary judgment on the ground that Commercial's action in federal district court was improperly brought since the parties mutually agreed in their contracts to submit disputes to arbitration.

The principal parties in this action are Morey S. Duman (Duman), the sole general partner of Commercial, and Irving J. Louis, Jr. (Louis), a first vice president of Bache and head of its metals department. During May, 1969, Louis telephoned Duman to urge him to open an account with Bache. Duman followed this suggestion and traded in general commodities through Commercial's margin account. Duman later switched the account to one not requiring marginal deposits and traded in electrolytic copper. During the four month period from April 7 to August 7, 1970, Bache sold three million pounds of electrolytic copper to Commercial at an average price of nearly 66 cents per pound, a financial undertaking of two million dollars. Between April and the first scheduled delivery in December, 1970, copper prices plunged. As a result Commercial refused to accept delivery of the shipments. Bache thereafter liquidated the contracts at a loss of $537,175.

Commercial promptly instituted this action. Its position was that Louis on behalf of Bache induced Commercial to enter into a discretionary account with Bache in early 1970 by means of untrue and misleading representations. Commercial alleged these misrepresentations to be: (1) the price of copper was bound to rise; (2) Louis had special information and contacts which would assure Commercial a profit; and (3) the account would be carefully managed and supervised in all respects by Louis and Bache. Commercial further alleged that while Louis was buying the electrolytic copper for Commercial he failed to disclose that: (1) from a technical standpoint it appeared likely that copper prices would fall rather than rise; (2) from a fundamental standpoint it appeared likely that copper prices would fall rather than rise; (3) Bache's sophisticated customers were generally selling rather than buying copper; and (4) Bache and Louis failed at any time up through December 14, 1971, to hedge or close out plaintiff's open position, despite the fact that primary and other copper prices had experienced the sharpest decline in years. Commercial charges that Louis' misrepresentations violate Rule 10B-5(1), (2) and/or (3)[1] and were perpetrated by use of the mails and interstate telephone calls.

---

1. Rule 10B–5 Employment of Manipulative and Deceptive Devices.

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of a national securities exchange,
   (1) to employ any device, scheme or artifice to defraud;

   (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, not misleading, or
   (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,
   in connection with the purchase or sale of any security.

Commercial further asserts that Louis' wrongful conduct violated the fiduciary duty of a broker to his customers, and violated New York's Blue Sky Law (the Martin Act).

Appellees in their answer deny acting as broker for Commercial during the period in question. Bache contends that it sold as principal to Commercial the electrolytic copper; in support of this assertion it introduced the 15 contracts between Bache and Commercial for the copper. These contracts, all of which are identical and are signed by Duman, expressly and unequivocally identify Bache as seller and Commercial as buyer. In corroboration of the charge that Commercial understood the buyer-seller relationship, a contract identical to those in dispute was introduced showing that in 1969 Commercial purchased and accepted delivery on electrolytic nickel cathodes from Bache. Other exhibits were introduced demonstrating that on previous occasions Commercial had accepted delivery on electrolytic copper. Finally appellees attacked the jurisdiction of a federal district court to hear the action since all the contracts in dispute provide for arbitration of any claim or controversy arising out of or in connection with the agreement.

The trial court after reading through the pleadings, exhibits and affidavits held there was no genuine issue of material fact with respect to (a) federal jurisdiction and the arbitration clauses contained in the contracts; (b) the execution and delivery of the 15 contracts; and (c) the absence in the transactions between the parties of discretionary authority or dealings and of the common enterprise and promotional efforts necessary to find an "investment contract." As no material issues of fact were alleged, summary judgment for appellees was accordingly granted.

Our court has been explicit in defining under what conditions summary judgment may be granted. The ultimate purpose of summary judgment is to pierce the allegations of the pleadings to show there are no genuine issues of material fact. If there is an absence of material issues then the movant is entitled to judgment as a matter of law. 6 J. Moore, Federal Practice, ¶ 56.02 [10], at 2043 (2d ed. 1972). Because the effect of summary judgment is a judgment in bar, however, the courts should be careful in granting such motions.

> . . . [W]hile it is the duty of the trial court to grant a motion for summary judgment in an appropriate case, the relief contemplated by Rule 56 is drastic, and should be applied with caution to the end that litigants will have a trial on bona fide factual disputes. Under the rule no margin exists for the disposition of factual issues, and it does not serve as a substitute for a trial of the case nor require the parties to dispose of the litigation through the use of affidavits. The pleadings are to be construed liberally in favor of the party against whom the motion is made. . . .

Machinery Center, Inc. v. Anchor National Life Insurance Co., 434 F.2d 1, 6 (10th Cir. 1970); Bushman Construction Co. v. Conner, 307 F.2d 888 (10th Cir. 1962).

The lower court, in granting summary judgment, was forced to determine whether the disputes arising out of the contracts signed by Bache and Commercial would be resolved in federal court or by arbitration as provided by the United States Arbitration Act of 1925, 9 U.S.C. §§ 1–14. If the contracts are no more than contracts to purchase copper at a future date, the arbitration clause found in each contract is binding on our court and precludes us from exercising jurisdiction. *See* Caloric Stove Corp. v. Chemical Bank & Trust Co., 205 F.2d 492 (2d Cir. 1953). If the contracts are investment contracts, however, the judicial forum cannot be waived by the contracting parties. Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).

Determining what constitutes an investment contract is no easy matter. As

used in the Securities Acts, "investment contract" is a "nebulous term, difficult of definition and even more difficult of application." Belhumeur v. Dawson, 229 F.Supp. 78, 81 (D.Mont.1964). Its purpose is "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." SEC v. W. J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). The Court has defined investment contract as:

> a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

SEC v. Howey, supra at 298–299, 66 S. Ct. at 1103.

Commercial takes the position that commodities transactions may be the subject matter of an investment scheme which is itself an investment contract and security. It necessarily follows that if the investment scheme constitutes an investment contract it falls within the definition of a security as provided in § 3 of the Securities Exchange Act, 15 U. S.C. § 78c(a)(10).[2] Commercial also urges since the facts alleged in its complaint and Duman's affidavit establish an investment scheme by Louis, the lower court erred in granting a motion for summary judgment.

Bache contends there is no investment contract under the Howey definition because the parties entered into individual, direct transactions involving the purchase and sale of copper. It is their position that elements of general offering, common enterprise, and reliance on the efforts of a manager or promoter for the achievement of profit are lacking. Appellees therefore urge us to accept the reasoning in Sinva, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 253 F.Supp. 359 (S.D.N.Y.1966), where it was found that a sugar futures contract was not a securities contract. It was simply an agreement for the delivery of a specified quantity of a commodity at a given future time.

We do not agree with Bache's position that Commercial raised no material issues with respect to the securities laws. In Sinva the issue was whether sugar futures contracts were securities. In our case the issue is whether the investment scheme of Louis constitutes an investment contract. If Louis' statements to Duman, as alleged in appellant's complaint, implied that all investment decisions would be made by Louis, while promising Commercial large profits, we might have a discretionary account constituting an investment contract even though the copper contracts which lay behind the arrangements are not themselves securities. *See* Continental Marketing Corp. v. SEC, 387 F.2d 466 (10th Cir. 1967), cert. denied, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968); Berman v. Orimex Trading, Inc., 291 F. Supp. 701 (S.D.N.Y.1968); Maheu v. Reynolds & Co., 282 F.Supp. 423 (S.D. N.Y.1967).

Commercial in its complaint and Duman in his affidavit allege that Louis stated: (1) he had special information and contacts which would assure Commercial a profit and (2) that he would carefully manage and supervise Commercial's account in all respects. As the court emphasized in Maheu v. Reynolds & Co., supra at 429:

> The line [between what is a security and what is not] is drawn . . .

---

2. The term "security" means any note, stock, treasury stock, bond debenture, certificate of interest or participation in any profit sharing agreement or in . . . any collateral-trust certificate, preorganization-certificate or subscription, transferable share, investment contract, voting trust certificate, certificate of deposit for a security, or in general, any investment commonly known as a "security". . . .

where neither the element of a common enterprise nor the element of reliance on the efforts of another is present.

Appellant's complaint raises an issue as to Commercial's reliance on Louis' representations which must be resolved before a court can determine the status of Bache and Louis.

■ Appellees and the lower court relied heavily on the fact that Commercial signed contracts which identified Commercial as the buyer and Bache as the seller, thereby proving that the contracts were purchase contracts with all terms and conditions stated in the instruments. We do not place such reliance on these written "purchase contracts." Although Duman signed each contract upon receiving it from Bache's office in New York City, Louis admitted in his deposition that it was Bache's procedure to close the balancing transaction on the same day they received the order; it was not their policy to wait for a written contract before entering into the balance of the transaction. Duman also stated that he considered the contract completed over the phone. The terms and conditions of the contract were therefore made over the telephone rather than stated in the written contract. Under these conditions it is necessary for us to look outside the written document to determine the agreement between both parties. SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); Anderson v. Francis I. duPont & Co., 291 F.Supp. 705 (D. Minn.1968).

The lower court erred in granting appellee's motion for summary judgment at this stage of the proceeding. There are issues of material fact which cannot be determined by reading over the pleadings, affidavits and exhibits. Commercial's allegations cannot be proved unless it is given an opportunity to present evidence backing up its assertions. For the court to grant summary judgment at this stage of the proceeding effectively denies Commercial the opportunity to prove its charges of fraud. Commercial's allegations in its complaint are stringently denied by Bache and Louis. The affidavit of Duman and Louis are contradictory in material respects, and the only way to sift through these contradictory statements is by allowing Commercial to present evidence on its charges.

We must emphasize that we are in no manner implying that Commercial's agreement with Bache constituted an investment contract. At this stage of the proceedings we do not have the evidence before us to make such a determination. Our decision only states that appellant's complaint and affidavit allege issues of material fact which cannot be resolved without further proceedings.

The order granting summary judgment is set aside, and the action is remanded for further proceedings consistent with this opinion.