**W. B. LONG, d/b/a W. B. Long Company and Robert Manning, Jr., d/b/a Webb Cotton Company, Plaintiffs,**

v.

**MARION MANUFACTURING COMPANY, a corporation, Defendant.**

Civ. A. No. 74–659.

United States District Court,
D. South Carolina,
Greenville Division.

July 16, 1974.

Theodore A. Snyder, Jr., Greenville, S. C. (Wofford & Snyder, Greenville, S. C., on brief), for appellant.

O. G. Calhoun (H. R. Stephenson, Jr., Greenville, S. C., on brief), for appellee.

H. R. Stephenson, Jr., Kendrick, Stephenson & Johnson, and O. G. Calhoun, Jr., Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S. C., for defendant.

### ORDER

Before WINTER, CRAVEN and RUSSELL, Circuit Judges.

HEMPHILL, District Judge.

Defendant Marion Manufacturing Company (hereinafter designated either "defendant" or "Marion"), target of a damage claim arising out of certain cotton-future-delivery contracts, moves for a stay of the action, and asks that

this court compel arbitration under the arbitration section of the United States Code (9 U.S.C. § 1 et seq.). The motion, dated June 13, 1974, is defendant's initial response to a complaint filed May 24, 1974. The complaint, after reciting diversity citizenship and jurisdictional amount,[1] alleges that plaintiffs made arrangements to furnish cotton under a contract dated June 19, 1973 [2] in which defendant made to plaintiffs a firm offer to buy cotton, and acting on the offer of purchase, plaintiffs made arrangements to buy 1200 bales of cotton from farmers in Louisiana to furnish to defendant, to be delivered in April, May, and June, 1974, at a price, later fixed by defendant, as it had the office and right to do, at an average of 71.82 cents per pound, and defendant, having inspected a sample from each of the bales, approved them; that on April 9, 1974, plaintiffs shipped 200 bales which defendant received, accepted, weighed and retained. Thereafter, defendant refused to pay for same, to the damage of plaintiffs in the sum of seventy-two thousand two hundred and forty-three and 02/100 ($72,243.02) dollars. Plaintiffs express a willingness to complete the 1200 bale contract at the price of 71.82 cents per pound and ask specific performance of the remaining part of the contract.

At the hearing before this court, all parties admitted that plaintiffs and defendant entered into four separate contracts. Each contract was evidenced by a letter of confirmation from defendant to plaintiff on which plaintiffs executed acceptance. The first contract (no. 100), dated February 1, 1973, was for 1000 bales of cotton, rain grown, strict low middling and strict low middling bright quality, 1 1/16" staple length, priced at 33.00 cents per pound ($33.00 per hundred pounds) to be delivered in "equal weekly deliveries beginning week of October 6, 1973, November thru December 1973". The second contract (no. 102), dated March 16, 1973, was for 1200 bales of cotton, of the same quality and length, at a price of 36.75 cents per pound ($36.75 per hundred) to be delivered 200 bales each month, October, 1973 thru March, 1974. The third contract (no. 105), dated June 12, 1973, called for 1200 bales of cotton of the same quality, at a price known as "buyer's call" and provided "Equal Weekly Delivery April-May-June-1974". The fourth contract (no. 106), dated November 5, 1973, called for 2000 bales of the same quality,[3] at a price known as "800 on July Buyers Call" and delivery was specified "Equal Weekly Deliveries beginning first week of July thru September—1974". All of the contracts provided in their terms for the inclusion of "Mill weights-No Patches—No allowances for cotton bagging. Southern Mill Rules 1971, as amended by specification form no. 71–67".

It is undisputed that as to contract no. 1, plaintiff was 167 bales short in its delivery, and as to contract no. 2, plaintiff was 160 bales short of its delivery. Plaintiff claims that as to these contracts, plaintiffs told defendant that the rains came and the floods descended, so that they could not perform, as the cotton which they had contracted to deliver to defendants was cotton which was not produced because of the act of God in bringing on such weather and thus plaintiffs were relieved of their duty to perform the contract under the provisions of the Uniform Commercial Code.[4]

---

1. 28 U.S.C. § 1332.

2. It is significant that the complaint fails to mention three other contracts.

3. Defendant only purchased one quality cotton.

4. Section 10.2–615, South Carolina Code, 1962 Annot. provides; in part:

Excuse by failure of presupposed conditions. —Except so far as a seller may have assumed a greater obligation and subject to the preceding section (§ 10.2–614) on substituted performance:

(a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his

Plaintiffs deny that the tremendous price differential has anything to do with its decision to attempt to ship the goods under the third contract, which has a higher price, and plaintiff says that the seller has the right to select the applicable contract under the provisions of the Uniform Commercial Code.[5] In support of his contentions, defendant submits an affidavit of W. B. Long, one of the plaintiffs, which he not only interprets Southern Mill Rules as to arbitration but also goes considerably into the facts of the case.

All parties agree as to what the terms of the Southern Mill Rules of 1971 contain. The disagreement is as to its application. All parties agree that Southern Mill Rule 43 of 1971 does not apply to this case. They are in dispute as to whether or not Rule 44 applies. Rule 44 provides:

> All disputes between buyer and seller as to whether a shipment or shipments conform to the terms of the sale, except as to quality, or the amount of the allowance or interpretation of any section of these rules, shall be referred to the Board of Appeals upon request of either party, and the decision of the Board of Appeals shall be final. In addition, the Board of Appeals shall render a decision, which decision shall be final, upon request of either party, in case of a dispute between two shippers or between two mills as to the matters listed in the previous sentence where either party is a member of at least one of the organizations listed in Section 1 and where both parties have agreed in written contract to abide by the Southern Mill Rules and to abide by the decision of the Board of Appeals in the event of a dispute. No person interested in the matter involved shall serve as a member of this Board. The Board is set up by the President of American Textile Manufacturers Institute, Inc., appointing one member; the President of American Cotton Shippers Association, appointing one member; and these two members if in disagreement, shall appoint a third member; and the members shall also appoint a secretary.

## APPLICABLE FEDERAL STATUTES

On July 30, 1947, Congress enacted into law certain statutes, catalogued under Title 9 of the United States Code, and entitled "Arbitration" 61 U.S.Stat. at Large 669. Certain provisions of that title are necessarily considered here.

Initially, § 1 provides, in part:

> "Maritime transactions" and "commerce" defined * * * exceptions to operation of title. * * * "commerce," as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States * * *.

Title 9, § 2 provides:

> Validity, irrevocability, and enforcement of agreements to arbitrate. A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to per-

duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

5. Section 10.2–501(1)(b) provides: Insurable interest in goods; manner of identification of goods.—(1) The buyer obtains a special property and an insurable interest in goods by identification of existing good as goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs.

(b) If the contract is for the sale of future goods other than those described in paragraph (c), when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers.

form the whole or any part thereof, of an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Title 9, Section 3 provides:

Stay of proceedings where issue therein referable to arbitration. If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

It is under this last section that defendant pitches the motion under consideration.

As is noted by United States District Judge (now Circuit Judge) Russell in *Corbin v. Washington Fire & Marine Ins. Co.,* 278 F.Supp. 393 (D.S.C.1968), affirmed, 398 F.2d 543 (4th Cir. 1968):

The arbitration of controversies, it has been repeatedly stated in the decisions and evidenced in both state and federal statutes, is favored in law. It is regarded as quasi-judicial in character and function. Arbitration, even as any judicial hearing, cannot proceed without evidence and the right of the parties to present argument; it cannot operate in a vacuum. It accordingly contemplates and normally requires the receipt of evidence, though not bound strictly in its reception to the rules of evidence.

\*   \*   \*   \*   \*   \*

The interstate nature of these transactions is admitted by all parties as a practice of commerce between parties of Greenville, South Carolina, and Marion, North Carolina. (The first two contracts state the quality of the cotton is to come from the Memphis, Tennessee, territory to be delivered at the Marion Manufacturing Co., Marion, North Carolina, or the Clover Mills in South Carolina. The third contract is not so specific, but shows the contract to be for the account of Marion Manufacturing Co., Marion, North Carolina, and the fourth contract again refers to the Memphis territory). Diversity, as alleged in this complaint, has not been challenged. Of course, Title 9 is applicable only if the contract evidences a transaction involving interstate or foreign commerce. *Medical Development Corp. v. Industrial Moulding Corp.,* 479 F.2d 345 (10th Cir. 1973); *Varley v. Tarrytown Associates, Inc.,* 477 F.2d 208 (2d Cir. 1973).

## CONTENTIONS OF THE PARTIES

Plaintiffs admit the four contracts between the parties, and insists that each contract is separate and distinct and not interrelated or interdependent; admits the failure to compel delivery on the first two contracts, but contends that they were relieved of making delivery of the 327 bale shortage by an act of God in the form of unusual rains and a flood. Plaintiffs contend that verbal agreements were entered into, as to such matters, contemporary with the signing of the contract, and that defendant knew that plaintiffs had entered into contracts with farmers in a particular area of Louisiana for the growth of, and sale to, plaintiffs, for future sale, of a similar amount of cotton, and knew that plaintiffs' deliveries were contingent upon their making the underlying contracts with the farmers. Plaintiffs' proposed order states, "although plaintiffs raise other defenses, it is apparent that the Act of God issue is a central point of contention between the parties as to these contracts." Plaintiffs are mainly concerned with the last two contracts,

claiming their relief from the initial two contracts by Act of God.

Plaintiff positions its second major issue as that of identification of the contract. Plaintiffs claim they drew samples from all the 1200 bales of cotton proposed to delivery under the third contract, and identified the bales by tag numbers and thereafter shipped samples to defendant, who inspected and approved them for application to the third contract. Plaintiffs say they identified the cotton as applying to the third contract by an express entry on the invoice and further identified each bale shipped by tag number, thus satisfying the requirements of Uniform Commercial Code, § 10.2–501(1)(b), S.C.Code, 1962 Annot., supra.

Plaintiffs further rely on its interpretation of the term "shipments conform" in Southern Mill Rule 44, so as to eliminate the application of arbitration of the issues in question.

Defendant counters that 9 U.S.C. §§ 1 through 3 control, and that the plaintiffs, having agreed to arbitrate, cannot now pursue a remedy in this court without complying first with the arbitration provisions of the contract. Defendant contends that the language of contract nos. 1 and 2 control, and that plaintiffs are still in default as to the 327 bales.

Plaintiffs rely heavily on the affidavit of W. B. Long, one of the plaintiffs, who, in interpreting Rule 44, says that the same is confined to arbitration of controversies relating to whether "shipments conform" to the terms of the sale. The affidavit states that the practice of identification of shipments was followed as to the 200 bales of cotton, which affiant says were shipped under the third contract, but makes no reference to any identification as to the first bales shipped, i. e., the missing bales. He states that Marion Manufacturing Co. knew that the cotton was to come from certain areas in Louisiana and that in April and May 1973, long after the parties had entered into the first two contracts, thousands of acres were flooded along the Mississippi River and its tributaries and the land did not dry in time for the planting season. In addition to this fact, unseasonable rains fell during the harvest season in another parish of Louisiana, during the first week of June 1973; that plaintiffs informed defendant of the conditions in Louisiana and advised that the deliveries would fall short by approximately 10 percent on the first two contracts; that plaintiffs delivered every bale that was received from the growers of Louisiana to fullfill the first two contracts but failed to complete the contract. He also includes a list of the 200 bales which were shipped as to tag number, weight, etc.

Defendant's exhibit no. 1 is an outline of the services available and the procedure for a submission of disputes of the cotton trade to the Southeastern Arbitration Appeal Board. Of significance in this controversy, in part, is as follows:

Outline of services available and procedure for submission of disputes:

The Appeal Board consists of three members, one appointed by the President of the American Cotton Manufacturers Institute, Inc., and one appointed by the President of the American Cotton Shippers Association; those two select a third member from the trade at large who, in their judgment, is familiar with the Rules and the practices of the trade. All serve without compensation, donating their services for the convenience of the members of the above two Associations, and render decisions on disputes referred to the Board, where one or more of the parties thereto, are members of either of the organizations mentioned above.

*The Board decides only those disputes which arise from disagreement as to the correct interpretation of purchase and sales contracts, mill rules, etc.* (Emphasis added).

Cases submitted to the Appeal Board must comply with the conditions stated below and briefs covering same must

be forwarded to the Assistant Manager of the Cotton States Arbitration Board, Atlanta, Georgia, who will submit the matter to each member of the Appeal Board, after removing all clues as to the identity of any of the parties at interest. In the event, however, that a member of the Appeal Board itself is involved in the controversy, the Arbitration Board will submit the case to those members not so involved. Should the members not involved be unable to agree in their findings, they shall appoint a third party mutually agreeable, to act with them.

Defendant's exhibit no. 2 is an affidavit of John J. O'Hern, Manager of the Cotton States Arbitration Board, who examined the complaint in this action, and, without revealing the parties, communicated with the board about the general nature of the case. He states that: "Based on my examination of those documents, and based on my communication with the Board, it is my opinion that the dispute between those parties is a dispute over which the board of appeals would take jurisdiction." A copy of the complaint is attached to his affidavit.

Defendant's exhibit no. 3 is an affidavit of Earle Billings, Executive Vice-President and Secretary of the American Cotton and Shippers Association, who, as Secretary, maintains the files of all of the decisions of the appeal board. He attaches, as illustrations, three separate cases. In Southeastern Appeal Board case no. 80, the court finds the following statement:

This case involves a nondelivery of cotton under contracts which are now past due. The seller claims there was a verbal agreement with an employee of the buyer that the seller would take all the time needed to make delivery. The buyer's employee is seriously ill and cannot be contacted concerning this matter, and it is not believed that he will ever be able to testify regarding same. However, the board feels that this does not enter into the case

since the contract specified definite delivery date, and if there had been any different agreement they should have been embodied in the contracts.

Attached to these papers are the buyer's brief and the seller's brief and further information pertinent thereto.

Southeastern Appeal Board Case no. 71 states in part as follows:

The case involves a sale of 160 and 396 bales respectively, covering actual samples approved. From the evidence submitted by seller, 306 bales were shipped direct to various mills and paid for by buyer. 127 bales were shipped to a buyer warehouse in a city where buyer was located but these are not paid for by the buyer. This left a balance of 127 bales to be paid for and 123 bales to be shipped and paid for, a total of 250 bales on which delivery had not been completed.

The case goes on to recite that the seller was claiming the buyer cancelled and the seller lost almost $8,000 because of the cancellation.

The attached case no. 79 is similar. Of course, none of the sample cases are identical with the case in question.

## FINDINGS AND CONCLUSIONS OF THE COURT

The sole question before this court is the scope of the arbitration agreement. From the facts before the court, and the applicable law, the court is of the opinion that the disputes between plaintiffs and defendant here involve, not so much a narrow question of shipment, but whether there was a verbal agreement outside of, and superseding, the contracts defendant put in evidence. Plaintiffs seek to invoke a verbal agreement for avoidance of its contractual obligations because of a claimed Act of God. Defendant says that the first two contracts, no. 100 and no. 102 are still in force, and that the 200 bales should have been applied to those contracts. It is not a question here of whether or not plaintiff shipped the 200 bales to defendant, but to which

contract they should be applied, and the application of the contractual terms to the shipment involved. Both parties to the dispute are parties to the contracts requiring them to arbitrate any disputes arising between them, so there is no lack of mutuality in the arbitration clause. *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064 (2d Cir. 1972). It has been held that a contract would be enforced between a general contractor and a sub-contractor requiring the sub-contractor to participate in arbitration proceedings between the owner and contractor sought by the owner's claim for damages arising out of alleged failure to perform by the sub-contractor. *Uniroyal, Inc. v. A. Epstein & Sons, Inc.*, 428 F.2d 523 (7th Cir. 1970). Where the scope of the arbitration agreement is fairly debatable and reasonably in doubt the court should decide construction to be in favor of arbitration. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

The application of the Uniform Commercial Code, if appropriate, could be presented before the arbitration board/committee as well as any other issue. In approving arbitration as a means of settlement of disputes, Congress conceived a speedy disposition of disputes without the delay of extended court proceedings. *Trafalgar Shipping Co. v. International Milling Co.*, 401 F.2d 568 (2d Cir. 1968), *Aerojet-General Corp. v. American Arbitration Ass'n*, 478 F.2d 248 (9th Cir. 1973). There is no exclusion clause in the federal arbitration statutes avoiding an agreement to arbitrate because of the applicability of a state law. *Southeastern Enameling Corp. v. General Bronze Corp.*, 434 F.2d 330 (5th Cir. 1970) is authority for the proposition that, where the evidence is undisputed that the contract evidenced a transaction involving commerce, as defined in 9 U.S.C. § 1, the validity, revocability, and enforcement of the agreement are subject to the act under 9 U.S. C. § 2.

■ This court has examined the issues in this case with the liberal federal policy, favoring arbitration, in mind. All doubts have been resolved in favor of arbitration. *Metro Industrial Painting Corp. v. Terminal Construction Co.*, 287 F.2d 382, 385 (2d Cir. 1961); *Coenen v. R. W. Pressprich Co.*, 453 F.2d 1209 (2d Cir. 1972), cert. denied, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337. Of course, a party to a contract can waive his right to arbitration, but such is not the case here. See *General Guaranty Ins. Co. v. New Orleans General Agency, Inc.*, 427 F.2d 924 (5th Cir. 1970). The court finds, also, that the disagreement here is well within the scope of the arbitration clause of the contract. *Commercial Iron & Metal Co. v. Bache & Co.*, 478 F.2d 39 (10th Cir. 1973), *Erving v. Virginia Squires Basketball Club*, supra. This court recognizes the limits of its authority: it can compel arbitration only when the parties have agreed to arbitrate. *Local Union No. 4264 v. New Park Mining Co.*, 273 F.2d 352 (10th Cir. 1959); *International Union of Operating Engineers, Local 150 v. Flair Builders, Inc.*, 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248.

These are contracts for goods and services, and clearly within the contemplation of the arbitration provisions of 9 U.S.C. § 1 et seq.

The motion of defendant is granted.[6]

And it is so ordered.

---

6. Under the provisions of 28 U.S.C. § 1292(b) this court certifies that, in the opinion of this humble tribunal, the order hereinabove published involves a controlling question(s) of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this order may materially advance the ultimate termination of this litigation.