George GARFIELD, Appellant,

v.

T. C. STRAIN and R. E. Maresh, Appellees.

No. 7175.

United States Court of Appeals Tenth Circuit.

June 21, 1963.

Rehearing Denied Aug. 7, 1963.

---

Robert C. Wilson, Lakewood, Colo., for appellant.

Milton J. Blake and Thomas Smart, Denver, Colo., for appellees.

Before MURRAH, Chief Judge, and BREITENSTEIN and HILL, Circuit Judges.

MURRAH, Chief Judge.

This is an appeal from a judgment for Maresh and Strain, in their action to recover damages for Garfield's breach of a contract to purchase an undivided one-half interest in certain oil and gas leases with a test well drilled thereon. The action was filed in the Colorado State Court and removed to the Federal Court on requisite diversity.

The suit arises in this manner. Maresh, an experienced geologist, was the as-

signee of certain oil and gas leases covering land in Nebraska. To raise money for the drilling of a test well by Strain, he undertook to sell fractional interests in the leases. Strain knew Garfield, who was then living in New Jersey, and with whom he had apparently done business. Strain told Maresh that Garfield might possibly be interested in investing in the venture and, with Maresh's consent, called Garfield and offered him a one-half working interest in the Maresh leases. Garfield indicated an interest, and several days later Strain and Maresh by telephone conversation with Garfield concluded the sale. The next day a written contract signed by Maresh and Strain was mailed to Garfield in New Jersey. The contract provided that Garfield was to purchase a one-half interest in the leases for $10,500.00, and that for the same consideration, the sellers agreed to drill a test well on a portion of the leases. The contract further provided for formal delivery of the assignment and payment of the purchase price within 30 days "at the request of either party." Accompanying the contract was a geological report (prepared by Maresh) together with maps and other data pertaining to the leases. Also accompanying the contract was a letter from Strain to Garfield stating that the $10,500.00 purchase price included the total cost of the land and lease acquisition, geological services, staking and making location, as well as the complete drilling of the test well.

Strain promised to keep Garfield informed of the progress of the well and to bill him direct when it was completed. Several days later, the appellant signed the contract and returned it to the appellees.

After receiving the contract, Strain immediately moved onto location, drilled and completed the proposed test well as a dry hole, and made demand upon Garfield for payment of the purchase price. Garfield refused to pay the agreed price and this suit on the contract followed. The complaint recited the contract, alleged performance of all conditions precedent, and made formal tender of the assignments conveying a one-half working interest in the leases to Garfield, and prayed for judgment in the amount of the contract price. The answer admitted the execution of the contract and the drilling of the test well, but affirmatively alleged that the transaction involved the offer and sale of an unregistered "security" in violation of the pertinent provisions of the Securities Act of 1933 [1]; that Garfield, as the purchaser, was therefore entitled to rescind the contract; and that in any event, Strain and Maresh had breached the contract by failing to deliver the assignments to Garfield within the 30 days provided therein.

Upon the trial of the case to the court, the sellers asserted, and the trial court held, that the transaction was exempt from the registration provisions of the Act, because it did not involve any "public offering" [2]. The court further held

---

[1]. Securities Act of 1933, as amended, 48 Stat. 74, 68 Stat. 683.

Sec. 2(1). (15 U.S.C. § 77b(1). "The term 'security' means any * * * fractional undivided interest in oil, gas, or other mineral rights * * *."

Sec. 5. (15 U.S.C. § 77e(a). "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

Sec. 12. (15 U.S.C. § 77l. "Any person who—

"(1) offers or sells a security in violation of section 77e of this title * * * shall be liable to the person purchasing such security for him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon * * * upon the tender of such security, or for damages if he no longer owns the security."

[2]. Sec. 4. (15 U.S.C. § 77d. "The provisions of section 77e of this title shall

that the sellers fully performed their obligations under the contract by drilling the test well and by formally tendering in court the assignments of the one-half working interest to the purchaser, and entered judgment on the contract.

It seems to be assumed that if the sale was in violation of the Securities Act, i. e., if it involved a "public offering of unregistered securities", the purchaser is entitled to rescind the contract and no action would lie upon it. Cf. A. C. Frost & Co. v. Coeur D'Alene Mines Corp., 312 U.S. 38, 61 S.Ct. 414. For purposes of this appeal, we will indulge in the same assumption. It is conceded on appeal that the transaction involved the sale of an "unregistered security" within the meaning of the Act, and that the mails and other instruments of interstate commerce were used in the offer and sale. The narrow question then is whether the sale involved any public offering.

Neither the statute nor the decisions attempt to prescribe any rule of thumb for determining whether a given transaction involves a "public offering" as that phrase is used in the statute. The number, amount and manner of the offering are, however, distinctly relevant, and the general criterion is whether the particular persons affected stand in need of the protection of the Act. The Act was not intended as protection for those "shown to be able to fend for themselves." S. E. C. v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494; Woodward v. Wright, 10 Cir., 266 F.2d 108. The burden is upon the one claiming exemption from registration, to show the lack of a public need therefor, Woodward v. Wright, supra.

The trial court specifically held that the sellers had sustained the burden of showing that the sale was exempt and the Act inapplicable on the following grounds: (a) "The smallness of the transaction and the insubstantial number of offerees"; (b) "The fewness of the units offered and sold;" (c) " * * * under the surrounding facts and circumstances, no public interest stood in need of protection afforded by registration and none of the offerees and purchasers stood in such need; (d) "The close relationship and past dealings between plaintiffs and the offerees and purchasers, including the defendant, refutes a claim that there was a public offering involved;" (e) "The close acquaintance between the defendant Garfield and T. C. Strain growing out of a former real estate transaction and personal visits of plaintiff Strain by invitation in defendant's home and with defendant and his wife;" (f) "The request of defendant made of Strain while in Denver after having made many inquiries of Strain about Strain's oil business, to be given a chance to invest in some of Strain's future oil ventures;[3] (g) "The wide business experience of defendant Garfield in several businesses, including the stock market and ownership of oil stocks, place him in a class not needing the protection of the Act as to these particular securities;" and (h) "Others of the purchasers or offerees of interests were experienced in the business of prospecting for oil or were close personal friends of the plaintiffs and stood in no need of protection. It is sufficient to say that the evidence fully supports the trial court's findings and conclusions in that respect.

On the question whether Garfield is entitled to repudiate the contract

not apply to any of the following transactions:

"(1) Transactions by any person other than an issuer, underwriter, or dealer; transactions by an issuer not involving any public offering * * *."

3. At the time Garfield returned the contract to Strain, he enclosed a letter stating in part:

"I appreciate the fact that you kept me in mind in connection with some oil deals that you think well of, T. C., and as I said on the phone: anything that you think well of is good enough for me. I am not even an ignoramus in matters pertaining to the oil business, as you know, T. C., but somehow it has the same allure for me that it has had over the years for many others."

because the sellers failed to live up to their bargain by not delivering the assignments within the 30 days provided for in the contract, the short and conclusive answer is that Garfield never requested the delivery within that period or at any other time prior to the filing of this suit when they were tendered. The promise to assign and the promise to pay were mutual and concurrent, in that they were to be performed simultaneously. "As long as neither party makes any tender * * * on the one hand, or of payment on the other, neither party is in default, and the contract subsists." Walker Inv. Co. v. Fleming, 79 Colo. 434, 246 P. 207. Neither party is discharged from complete performance until he has tendered performance on his part, and demanded it of the other. Hoagland v. Murray, 53 Colo. 50, 123 P. 664. And see also Corbin on Contracts, Vol. 3, § 663 at p. 179. The trial court found that the assignments were timely tendered with the complaint, and we agree. No prejudice is claimed or shown, and the trial court's findings are conclusively binding here.

Finally, Garfield contends that the trial court erred in allowing appellees' judgment for the full contract price. He cites the general rule to the effect that the measure of damages for breach of a contract to purchase realty is the difference between the agreed price and the actual value of the property at the time of the breach. He argues that in the instant case, the only consideration for the purchase price was the assignment of the leases, and any testimony as to Strain's out-of-pocket expenses, incurred in drilling the test well, was wholly irrelevant since Strain was not a party to the contract. This argument is wholly without merit. Strain was a named co-seller in the contract. By the contract terms, Strain and Maresh agreed to deliver an assignment of a one-half working interest in the leases and drill a test well on a portion thereof, in consideration of which, Garfield agreed to pay $10,500.00. Strain and Maresh drilled the test well in accordance with the contract and tendered the assignments of a one-half working interest in the leases to Garfield. They are, therefore, entitled to a judgment for the full contract price with interest thereon, at the rate of 6% per annum, from the date of the commencement of the action.

Affirmed.