**M. Richard ANDREWS, Plaintiff-Appellee and Cross-Appellant.**

**v.**

**Linden BLUE et al., Defendants-Appellants.**

**Nos. 73-1393, 73-1394.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Oct. 17, 1973.

Decided Nov. 29, 1973.

Robert C. Burnstein, Oakland, Calif. (Stephen T. Susman of Berenbaum, Berenbaum & Susman, Denver, Colo., on the brief), for appellants.

Wm. Rann Newcomb, Denver, Colo. (Philip A. Rouse and J. Robert Fowler, Denver, Colo., on the brief), for plaintiff-appellee and cross-appellant.

Before SETH and DOYLE, Circuit Judges, and TALBOT SMITH,[*] District Judge.

WILLIAM E. DOYLE, Circuit Judge.

Plaintiff-appellee obtained a judgment in the court below amounting to $100,973.10 from defendants-appellants Linden Blue, James N. Blue and H. Gregory Austin. Several theories were advanced. Claims under § 12 of the Securities Act of 1933 (15 U.S.C. § 77a et seq.); the Securities and Exchange Act of 1934 (15 U.S.C. § 78a et seq.); and Rule 10b–5. Pendent claims under the Colorado Securities Act and other principles of Colorado law were also alleged. The controversy arose out of a joint venture in real estate. This property appreciated substantially in value. The basic contention which threads through all of the claims of plaintiff-appellee at trial was that various legal maneuvers were employed by defendants-appellants, all being designed to diminish the value of the 20 percent interest of the plaintiff-appellee in the property and simultaneously to enhance the value of the interests of the appellants.

This transaction began in October 1968 at which time the appellants, the Blues and Austin, entered into an agree-

---

[*] Of the Eastern District of Michigan, sitting by designation.

ment with appellee Andrews. Under the terms of this agreement Andrews contributed $36,899.22 and further agreed to use his real estate expertise as a consultant for the enterprise.

The agreement allowed the Blues faction to determine the type of organizational entity which was to be employed to develop the property (called Cherry Creek) provided that the share of Andrews' 20 percent would not be diluted or diminished. Andrews was not given the right to share in the management or in any decision to sell, mortgage or dispose of the property.

Andrews invested the agreed sum and devoted substantial time to the development of the property. The property was never developed by the individual parties. In July 1969, title was conveyed to a newly formed corporation called Cherry Creek Drive, Inc. At this time Austin was paid the amount of his investment and thereafter his participation was limited to his serving as attorney for the enterprise. In this capacity he acted in conjunction with the Blues to the extent that the trial court considered him to be a participant in the transaction which produced the economic injury to Andrews.

Prior to the merger there were 20 shares of issued stock in Cherry Creek Drive, Inc. All were issued in the names of the Blues and four shares were held by them for plaintiff's 20 percent interest.

The parties did not develop the property, and in the latter part of 1970 the Blues informed Andrews of an impending merger with a corporation called Medic-Shield Nursing Centers, Inc. At the same time they discussed with Andrews the possibility of buying out his interest.

The Blues had, prior to the merger, encumbered the property with a $90,000 mortgage. The proceeds were used by them for purposes other than the enterprise. Andrews was not told of this.

In correspondence with the Blues, Andrews, in discussing recognition of his interest under the proposed merger, stated that he would not object to the merger if he received listed stock in eschange for his interest in the property or guarantee that his (Andrews') shares would be registered so "that they will be marketable by me without limitation as to time following the registration."

Again, on October 15, 1970, Andrews wrote to James N. Blue asking for figures and detailed information concerning the assets of Medic-Shield. The letter noted the failure of Blue to respond to his prior request.

Andrews wrote to the Blues and Austin on October 26, 1970. He again called attention to his demands for information. In this letter he expressed dissatisfaction with the proposed merger, pointing out that the value of the shares received would be far less than his cash investment if the shares could not be transferred. Following this the Blues sought to allay Andrews' fears and apparently succeeded judging from his letter of March 5, 1971, which stated that he was reassured by the fact that he would receive listed stock on the same basis as the Blues. He added that the transaction was satisfactory to him so long as his stock was worth the current market value of the land.

In a subsequent letter, however, James N. Blue wrote that Andrews would receive 20 percent of the 81,923 shares received by Cherry Creek Drive, Inc. in connection with the merger. The letter went on to say that Medic-Shield stock was then traded over the counter, although it was not listed on any stock exchange.

It is thus clear that Andrews sought stock which would after the merger be freely marketable. Ultimately his object was to prevent dilution of his interest in the real estate.

The proxy statement advising of a special shareholders meeting on March 12, 1971 of Medic-Shield stated that Medic-Shield would be merged with certain real estate companies of which Cherry Creek Drive, Inc. was one and

that the surviving company's name would be Colorado & Western Properties Corporation. The statement represented that the Blues owned 100 percent of Cherry Creek Drive, Inc. Prior to the merger Austin wrote the attorney for Medic-Shield assuring him that Andrews could neither approve nor disapprove of the merger since he had no voting rights in the Cherry Creek Drive, Inc. stock.

The mentioned proxy statement was not sent to Andrews. The Blues and Austin apparently believed that he was not entitled to such notice. Interestingly, however, mention was made of the proxy statement in an original draft of Blue's letter of March 11, 1971 to Andrews, but the letter as finally written was changed so as to omit this sentence.

On June 17, 1971, Andrews received a stock certificate for 16,385 shares of the merged corporation. These shares were issued to him in satisfaction of his 20 percent interest in the Cherry Creek property. The stock certificate has a restrictive legend which reads as follows:

> These securities have not been registered under the Securities Act of 1933. They may not be sold or offered for sale in whole or in part in the absence of an effective registration statement covering them under the act, or an opinion of counsel satisfactory to the company that such registration is not required.

As an indication of the greatly enhanced value of the Cherry Creek property at the time in question, a contract for the sale of this property was entered into on February 15, 1971 by the Blues for a purchase price of $1,049,990.49. Notwithstanding this, Andrews' 16,000 plus shares of the merged corporation had a negligible value at the time of the merger. Had the stock not been restricted it would have sold for a total price of approximately $47,000. The restrictive legend, however, greatly reduced it. Its exact value is not an issue because it is clear from the record that Andrews elected to rescind the transaction. The great variance between the value of his stock and the value of his 20 percent interest in the real estate is the bone of contention in the case. Andrews promptly tendered his stock into court and commenced the present action.

The district court granted relief under seven of the plaintiff's eight claims. As previously noted, counts one and two of the complaint set up claims for relief under § 12 of the Securities Act of 1933. Count three charged a Rule 10b-5 violation and the trial court treated these two together. Relief was also granted on the breach of contract and fiduciary obligation claims. One single money judgment was entered as a result of several theories of liability.

## THE ISSUES ADVANCED ON APPEAL.

The points posed by the defendants in seeking reversal of the judgment in favor of the plaintiff include:

The trial court's ruling that the issuance of the Colorado and Western stock was not exempt from registration;

The court's ruling that the interest on the 1968 real estate contract was a "security" within the meaning of the Securities Acts;

The ruling that the plaintiff was not barred or estopped by his conduct; and

The court's ruling that defendants violated their contractual and fiduciary duties.

Defendants also contend:

The action being one in rescission, the measure of damages must be limited to the amount which plaintiff originally invested.

In his cross-appeal Andrews contends:

That it was error for the trial court to disallow the $90,000 second deed of trust which the Blues had placed on the property in question before computing the 20 percent equity of Andrews in the property; and

That the trial court ought to have awarded reasonable attorney fees to him in accordance with a claimed right under the Colorado Securities Act.

## I. Exemption from Registration

Defendants claim that the issuance of Colorado & Western stock to the plaintiff was not a public offering within the meaning of Section 4(2) of the Securities Act of 1933,[1] which exempts private offerings from the consequences of the registration requirements, thus making Section 12(1) inapplicable.[2]

The trial court ruled that Andrews was not a knowledgeable investor and that he did not have access to the available information.[3]

The trial court's conclusion was entirely in accord with the Supreme Court's decision in S.E.C. v. Ralston Purina, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). The Securities and Exchange Commission had in that case tried to enjoin Ralston Purina from offering unregistered stock to its employees. The court was called on to determine the meaning of the term "public offering". In doing so the court looked to the purpose of the statute which was to protect the investor by promoting full disclosure of information considered necessary to make informed investment decisions. 346 U.S. at 124, 73 S.Ct. 981. It interpreted Section 4(2) in accordance with its purpose, concluding that the transaction is exempt from registration only when an offeree has had sufficient access to information similar to that made available to the offeree in a registration statement. So considered, an offering is private when made "to those who are shown to be able to fend for themselves." 346 U.S. at 124, 73 S. Ct. at p. 984.[4]

Defendants argue that plaintiff was a sophisticated investor with access to all relevant information. This argument fails, not only because the trial court's findings to the contrary were based on substantial evidence, but also because of the fiduciary relationship and the duty to disclose arising therefrom. The duty was particularly clear in view of the repeated specific inquiries directed by plaintiff to the defendants. Plaintiff had a basis for believing that his 20 percent interest in the enterprise would be protected. He was not placed on notice that defendants were carrying out legal maneuvers designed to depreciate plaintiff's interest and enhance their own.

Was the offering exempt because the other offerees might have been able to fend for themselves? We conclude that it was not. The statute is intended to promote full disclosure to every investor regardless of his particular business background. See Hill Corp. v. American International Franchises, Inc., 448 F.2d 680, 690 (5th Cir. 1971). Ral-

---

1. Section 4. The provisions of Section 5 shall not apply to . . .
   (2) transactions by an issuer not involving any public offering.
   Section 5 defines in detail the registration statement violations.

2. Section 12 authorizes a civil action for fraudulent offer or sale of a security.

3. The court said: "What is said in *Hill York Corp.* is fully applicable to Andrews. He was doing his best to find out what the deal was all about, but he was given the run around and was actually misled. He had invested some $36,000 and a lot of his time in the venture; he thought that he owned a 20% interest in readily saleable real estate which had appreciated greatly in value and he wasn't told that the stock which would be issued to him would be lettered and that if it could be sold at all, it could be sold only for an amount far less than his investment and even farther less than the fair value of the 20% interest he thought he owned in the real estate. Moreover, although he was a sophisticated real estate investor, he was a babe in the woods when it came to stocks. He, and insofar as the Blues and Austin are concerned, because of their conduct which was unknown to Medic-Shield, others needed the protection of the Act. Defendants have the burden of proving an exemption. The defendants Blue and Austin have not met that burden within the pronouncements of Lively v. Hirschfield (1971) 10 Cir., 440 F.2d 631.
   Defendants additionally urge that plaintiff had access to all relevant information, but he didn't. In fact, relevant information repeatedly requested by him was not supplied, and, most assuredly, the information concealed from him was material."

4. The legislative history is in accord with this approach. See H.R.Rep. No. 85, 73rd Cong. 1st Session (1933) pp. 5, 7, 15–16.

ston Purina rejects the idea that an exemption exists based only on the individual sophistication of the offeree and without regard to his actual knowledge concerning the issuer.[5]

Our court has held that the Ralston Purina standard of disclosure applies to all offerees. *See* Lively v. Hirschfeld, 440 F.2d 631, 633 (10th Cir. 1971). So the situation is not altered by the fact, if it be a fact, that the other offerees of Colorado & Western were able to fend for themselves.

■ The small number of shares issued does not cause the offering to be private. The Ralston Purina decision deals with this also. *See* 346 U.S. at 125, 73 S.Ct. at p. 981; *see also* S.E.C. Securities Act Release No. 285: Jan. 24, 1935.

■ Nor does the restrictive legend on the face of the shares serve to make the offering private. It is said that the legend is a precaution to prevent illegal distributions. It does not serve as a basis for exemption from registration.[6]

■ Defendants also claim that the offering was exempt because they were neither issuers nor underwriters and hence are within the sweep of Section 4(1) of the 1933 Act. Section 2(11) of the 1933 Act provides that an issuer includes any person directly or indirectly controlling the issuer. Here defendants controlled the issuer Colorado and Western. As a legal consequence they were issuers. But they were also "underwriters." The shares distributed to plaintiff were first issued to the Blues, who in name at least were the sole shareholders of Cherry Creek Drive, Inc. Under Section 2(11) of the 1933 Act they were underwriters because they received Colorado and Western shares for redistribution, and Austin was also an underwrit-

er because of his participation. See Quinn and Company v. S.E.C., 452 F.2d 943 (10th Cir. 1971).

■ It is clear that defendants have failed to sustain the burden which the law imposes on sellers of unregistered securities to prove an exemption. Lively v. Hirschfeld, supra; Garfield v. Strain, 320 F.2d 116 (10th Cir. 1963); Woodward v. Wright, 266 F.2d 108 (10th Cir. 1959).

## II. Whether the Plaintiff's Property Interest was in Law a Security

■ Appellants' contention is that plaintiff's percentage interest in the 1968 real estate venture failed to meet the statutory definitions contained in the Securities Acts, state and federal. The Securities and Exchange Act of 1934 § 3(a)(10) defines the term broadly and extensively.[7]

The trial court considered this interest to be plainly an investment contract and we agree, notwithstanding defendants' extensive argument that it is not.

The Supreme Court in S.E.C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) considered contracts to sell citrus groves to be investment contracts with management obligations on the seller. It gave effect to prior state court definitions and broadly defined the term as

> a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

328 U.S. at 299, 66 S.Ct. at p. 1103.

---

5. See I Loss, Securities Regulation 657 n. 53 (2d ed. 1961).

6. Non-Public Offering Exemption, S.E.C. Release No. 4552, Nov. 6, 1962. See also United States v. Custer Channel Wing Corp., 376 F.2d 675 (4th Cir. 1967).

7. The definition includes the term "investment contract" among a vast group of terms apparently designed to cover all indicia of property excepting only money and negotiable paper.

The Colorado Securities Act also includes investment contract and its definition is no less broad. *See* 1963 C.R.S. § 125–1–12.

The Court characterized its definition as a flexible rather than a static principle, one capable of embracing a wide variety of schemes. 328 U.S. at 299, 66 S.Ct. 1100.

This *Howey* definition is now a standard one. The only possible escape for the defendants is the fact that the profits in an investment contract ordinarily originate "solely from the efforts of others." Defendants point out that Andrews was to be a consultant in the development. This argument carries little weight. Andrews' role as a consultant was nil. It existed in name only. He had no managerial status. The Blues regarded and treated him as an outsider devoid of management rights—as one who should be satisfied to have his money returned.

Our cases in appraising this relationship have had regard for substance rather than form. Continental Marketing Corp. v. S.E.C., 387 F.2d 466 (10th Cir. 1967); Woodward v. Wright, supra. *See* Vincent v. Moench, 473 F.2d 430 (10 Cir. 1973), and *see* Commercial Iron & Metal Co. v. Bache & Co., 478 F.2d 39 (10th Cir. 1970); Gilbert v. Nixon, 429 F.2d 348 (10th Cir. 1970).

We hold therefore that the contract reference to Andrews as a consultant did not deprive the relationship of its character as an investment contract. The predominant aspect was investment looking to profits rather than management with attendant risk taking. Defendants must now bear the consequences of having relegated Andrews to an insignificant position.

We must also reject the defendants' argument that the Rule 10b–5 claim fails for lack of proof of scienter. Certainly intent in the odious or malicious sense is not required. The requisite knowledge of falsity is adequately evidenced. *See* Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir. 1971).

Defendants' argument that they made no omissions nor materially false and misleading statements to the plaintiff must also fail. The trial court's finding that "relevant information repeatedly requested by [plaintiff] was not supplied and, most assuredly, the information concealed from him was material" is sustained by the evidence. The detailed information concerning the nature and effects of the 1971 merger was actionable material non-disclosure.

### III. The Defenses of Estoppel and Waiver as a Bar to Plaintiff's Claims

The court's finding that plaintiff was not barred or estopped from seeking to rescind the merger is fully supported by the evidence. To have an effective estoppel or waiver there must be full knowledge on the part of the plaintiff. Where, as here, the crucial information was withheld or concealed the crucial element is not present. Plaintiff did not become aware of the legend on the face of the shares until June 17, 1971, at which time the shares were issued to him. There was no undue delay in tendering the shares back to the defendants and to the Clerk of the Court incident to the commencement of suit.

Defendants' argument that the terms of the contract itself created a binding estoppel is also untenable. Defendants are not allowed to violate the Securities Acts under the guise of the contractual provisions. The contract cannot be used as a shield for wrongdoing amounting to statutory fraud.

### IV. The Measure of Recovery

Damages were assessed on the theory of rescission effective at the time of the merger. Defendants maintain that the rescission relates back to the original investment and cannot take effect at the later date when plaintiff exercised the option to rescind. Defendants would thus return to plaintiff his original investment.

The security statutes which defendants have violated all permit a rescission type of remedy. *See* 15 U.S.C. § 77*l* (Claims 1 and 2: statute specifically

permits a rescission remedy for violations of §§ 12(1) and 12(2) of the Securities Act of 1933); 15 U.S.C. § 78j, 17 C.F.R. § 240.10b–5, and 15 U.S.C. § 78cc(b) (Claim 3: statute makes contracts or transactions void when they violate the statute); and 1963 C.R.S. § 125–1–21 (Claim 4: Colorado Securities Act specifically permits rescission remedy.)

Defendants' effort to relate back to the original investment is understandable. It is a difference between $36,899.22, the amount invested, and over $100,000, which the court considered to be 20 percent of the net proceeds of the sale.

▪ The trial court correctly selected the later date. Obviously plaintiff did not have a right to rescind until the attempt was made to give him stock which had a value which was far out of proportion to the value of the property. There can be no question about the issue of shares in the merged corporation being a purchase or sale.[8]

▪ Ordinarily, of course, the consequence of rescission would be return of the property. But the real estate had been sold to a bona fide purchaser; hence the next best solution was to give plaintiff the proceeds. Plaintiff was entitled to the fair value of his interest as of the time of the unlawful merger. Young v. Taylor, 466 F.2d 1329, 1336 (10th Cir. 1972). In a rescission action the proper measure is the amount lost rather than value of the bargain. Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 303 F.2d 527 (10th Cir. 1962); Esplin v. Hirschi, 402 F.2d 94 (10th Cir. 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459. Thus, we cannot accept defendants' argument that the actual award is to be measured by the benefit of the bargain. As we have indicated, the rescission takes effect on the illegal merger and not on the original purchase.

The trial court utilized the figure $1,049,990.49 as a starting basis for the award. This represented the contract price of the Cherry Creek real property. At the time of closing the value was increased somewhat but this was due to the purchaser moving the closing date forward one month. The trial court also subtracted the two encumbrances in arriving at the net figure.

▪ We are unable to understand why the second mortgage loan was subtracted by the court in computing plaintiff's damages. We noted above that this $90,000 loan was obtained by the Blues and its proceeds were used by them. In the light of this we are unable to agree that the plaintiff's net share should be affected by this loan. Accordingly, the trial court's determination of the net value by subtracting the $90,000 second loan is clearly erroneous and the judgment must be modified in respect to this by adding 20 percent of $90,000 to

8. Such an exchange of ownership interests in a merger transaction is clearly a "purchase or sale" under Rule 10b–5. S.E.C. v. National Securities, 393 U.S. 453, 89 S.Ct. 564, at 572, 21 L.Ed.2d 668 (1969). In that case, minority stockholders in company A who had, on the basis of fraudulent information, been convinced to vote for a merger of A into Company B, were held to have "purchased" shares of B stock with their own exchanged A stock. The court specifically stated that the "no sale doctrine" (Commission's Rule 133, 17 C.F.R. § 230.133) did not apply to 10b–5 cases, which arise under § 10(b) of the 1934 Securities Act, but only to cases arising under § 5 of the 1933 Act. In our case, claims one and two did arise under § 5 of the 1933 Act. However, following the same type of reasoning followed by the Supreme Court, which emphasized the broad protective purposes of the Securities Acts, the "no sale doctrine" of Rule 133 should not operate as a bar here, since by its terms it only applies when the minority stockholders have had an opportunity to vote on the proposed merger. Plaintiff was given no such opportunity. This court should rather follow the cases which call for a broad definition of "purchase or sale," see Knauff v. Utah Construction & Mining Co., 408 F.2d 958 (10th Cir. 1969) (a 10b–5 case) and regard plaintiff's forced exchange of his interest in Cherry Creek for Colorado and Western stock as a "purchase or sale" under all of the Federal securities laws involved in this case.

it. Similarly, plaintiff has pointed out in his brief that the trial court neglected to deduct a five percent sales commission fee ($52,499) from the total equity of the property prior to computing plaintiff's 20 percent interest. We agree with plaintiff that there is no reason to exonerate him from bearing his fair share of the expenses of sale. Plaintiff's recovery should thus be reduced by an amount equal to 20 percent of $52,499. In all other respects the court correctly determined the matter and correctly computed it as well.

### V. The Claim for Allowance of Attorneys' Fees under the Colorado Securities Act

■ Plaintiff asserts that a finding of liability of defendants under the Colorado Securities Act also entitles him to a mandatory award of reasonable attorneys' fees. He relies on 1963 C.R.S. § 125–1–21(1), which states:

> Any person who . . . [improperly offers or sells a security in violation of the statute] . . . is liable to the person buying the security from him, who may sue to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security and any income received on it, or for damages if he no longer owns the security.

The trial court construed this provision as permissive rather than mandatory, and declined to award attorneys' fees in this case. We agree with this ruling.

■ The argument based on Young v. Taylor, *supra*, is a circuitous one, and it does not offer authority for the proposition that the award is mandatory. Generally attorneys' fees are not allowed unless they are specifically authorized by contract or by statute. *See* 25 C.J.S. Damages § 50; 15 Am.Jur. §§ 142–146. *See also* Spencer v. Murphy, 6 Colo.App. 453, 41 P. 841 (1895); Publix Cab Company v. Colorado National Bank, 139 Colo. 205, 338 P.2d 702, 715 (1959). We perceive no error in the trial court's determination.

### VI.

We have considered the contentions in the briefs concerning breach of fiduciary duty of defendants to plaintiff in the 1968 agreement and the breach of contract claims. In view of the affirmance of the securities claims it is unnecessary to articulate the reasons for affirmance of these claims since the plaintiff is entitled to but one recovery.

Accordingly, the judgment is generally affirmed. It is reversed as to the reduction of plaintiff's recovery in connection with the $90,000 mortgage noted above. The cause is remanded in respect to this latter item with directions to add to the judgment in the amount indicated. The Court is also directed to make an appropriate adjustment charging Andrews with his share of the real estate commission.