**T. Benson FORD, Plaintiff,**

v.

**Harry E. CANNON, Defendant.**

**No. 73–297–Civ–Orl–Y.**

United States District Court,
M. D. Florida,
Orlando Division.

June 8, 1976.

Gene E. Putnam, Moore, Putnam & Larson, Inc., Houston, Tex., for plaintiff.

Terry S. Freedman, Gurney, Gurney & Handley, Orlando, Fla., for defendant.

## MEMORANDUM OPINION

GEORGE C. YOUNG, Chief Judge.

Plaintiff, T. Benson Ford, brought this action seeking damages for alleged violations of the Securities Exchange Act of 1934, § 10(b) [15 U.S.C. § 78j(b)] and S.E.C. Rule 10b–5 [17 C.F.R. § 240.10b–5]. In Count II of the complaint, plaintiff seeks to recover under the Uniform Commercial Code, § 8–306 [Fla.Stat. § 678.8–306].

Plaintiff, a resident of Houston, Texas, contends that the defendant, a Florida resident and Chairman of Board of Directors of Real Eight, Inc., transferred 20,000 shares of Real Eight "founders stock", which was unregistered and restricted, to one Frederico Carstens in a business deal in which the latter transferred 40,000 of OPRISA, his corporation, to defendant Cannon. Subsequent to this stock swap, Carstens, on two separate occasions, induced plaintiff to borrow large sums of money, $35,000 in total, from a Houston bank. The 20,000 Real Eight shares were used as collateral and given to plaintiff. Plaintiff then loaned the money he had borrowed to Carstens, who signed promissory notes in plaintiff's favor. Carstens thereafter defaulted on the notes, and plaintiff sought to sell some of the 20,000 shares to recoup his losses on the loans to Carstens. The shares could not, however, be sold, due to their restricted nature. It is further contended by plaintiff that nothing on the face of the stock revealed that it was restricted.

## FACTUAL BACKGROUND

In November of 1971 defendant Cannon, a Florida citizen, was Chairman of the Board of Directors of Real Eight, Inc., a Florida corporation. Plaintiff, a resident of Houston, Texas, was an architect and land developer.

In connection with his businesses Ford had been buying and selling real estate since about 1963 and traded on an average

of about $10,000 a year in the stock market. The largest single stock transaction engaged in by plaintiff involved approximately $100,000 worth of stock. Plaintiff has been an officer in six corporations as well as at least two banks. He received a BA and a BS degree from Rice University in addition to a Masters Degree in the Fine Arts from Princeton.

Real Eight, Inc., situated in Melbourne, Florida, was engaged in the business of salvaging and selling treasure from sunken Spanish galleons wrecked off the coast of Florida. In 1971 the corporation was having severe financial problems, and in order to remedy the situation, the officers of the corporation were attempting to get the company refinanced through the possibility of a merger with other corporations or by seeking investments from private individuals, or both. Pursuant to these efforts to refinance the company, Cannon sought the assistance of a friend, Dawson Newton, who in turn introduced Cannon to one Frederico Carstens.

Carstens was represented as being an international investor with contacts in various European markets and could consequently assist Real Eight in developing a cash flow through the placement in these markets of Real Eight's gold and silver treasure coins. Through several meetings with Carstens, Cannon learned that Carstens, from Panama, allegedly owned or controlled a company called OPRISA which was involved in several activities, including the establishment of an island real estate development off the coast of Panama, as well as the production of a fish protein concentrate. Further, OPRISA was attempting to acquire a contract to inspect the hulls of vessels using the Panama Canal to check for barnacle and shell fish growth below the water line. Such an underwater inspection process would require the development and use of specialized underwater equipment.

Carstens indicated to Cannon that the specialized equipment that Real Eight had developed and used in its ocean engineering division would be ideal for use in the under-water inspection process. Cannon, foreseeing that lucrative financial possibilities could flow from the acquisition of such an inspection contract, became interested in investing in OPRISA.

At about the same time, OPRISA, like Real Eight, was seeking investors, and in February 1971, plaintiff Benson Ford, was introduced to Carstens through a mutual friend in Houston, Texas. Ford, considered to be a potential investor, was advised of Carstens' enterprises in Panama, and in March or April of 1971, Ford invested in OPRISA, Carstens' company. In October of 1971, Ford again visited with Carstens, this time in Palm Beach, Florida, to meet some of Carstens' friends to discuss one of Carstens' other enterprises. Carstens' friends, Dawson Newton and one George Rich, were represented to Ford to have previously invested in, or were about to invest in, OPRISA. In early November of 1971 Ford again met Carstens in Palm Beach and in Melbourne, Florida, where Ford and Cannon were introduced to each other. Ford toured the Real Eight facilities in Melbourne and engaged in various conversations with Cannon and others over a two day period, November 9 and 10, 1971. During these tours and meetings, the President of Real Eight, John P. Jones, explained to Ford the financial structure of the corporation as well as its purposes and the potentials it was pursuing. Furthermore, it was explained to Ford that the company's founders stock was restricted in nature and non-transferable. Cannon considered Ford to be a potential investor in Real Eight and thus the possible means for the company to obtain the needed financial support. Carstens represented to Cannon that Ford was interested in investing and had invested in OPRISA.

Contemporaneously with these meetings on November 9 and 10, Carstens and Cannon entered into an agreement (Joint Exhibit 1) whereby Cannon would exchange 20,000 of his shares of Real Eight common stock for 40,000 shares of Carstens' OPRISA stock. The purpose of the agreement was two-fold. First, the transfer was made

to assist Carstens in his efforts to have Ford and others invest in OPRISA in order to develop the company into a larger enterprise. Secondly, the agreement provided a means for Cannon to invest in OPRISA on a temporary basis; the agreement provided that at the end of six months Cannon could elect to withdraw his 20,000 shares of Real Eight stock free of any and all encumbrances. The provisions of the agreement were discussed and its actual drafting was accomplished in the presence of Ford at the Real Eight facilities in Melbourne, Florida. The agreement was signed and the stock was transferred on November 10, 1971 at the Palm Beach International Airport in the presence of Ford. The 20,000 shares so transferred to Carstens was founders stock, was restricted, unregistered and non-transferable, but the stock certificate contained no legend or other statement to that effect.

Even though Ford had reason to know, by virtue of the explanations made to him by Jones and Ford's presence at discussions concerning drafting of the stock exchange agreement and at the signing of the agreement itself, the stock given Carstens by Cannon was non-transferable, it appears that in actuality Ford was not cognizant of the stock's restricted nature. Subsequent to this transaction Ford returned to Houston, Texas.

On or about November 16, 1971, Carstens appeared at Ford's office in Houston, Texas seeking to borrow a sum of money from him. Ford agreed, but only if Carstens could put up adequate security. Carstens thereupon presented the stock certificate for 20,000 shares of Real Eight stock which he had obtained from Cannon only a few days previously. Carstens also exhibited a stock assignment from Cannon to him. Ford then went to the Bank of Texas in Houston, Texas and had his banker, Mr. Charles R. Hrdlicka, examine the stock certificate. Ford then called his stockbroker and he then determined that the stock of Real Eight was trading at about $4.50 to $5.00 a share, thus indicating that the certificate for 20,000 shares was worth at least $90,000.

In reliance on the stock as security, Ford, on November 16, 1971 borrowed $25,000 from the bank and then immediately wrote a check to Carstens in the same amount. Carstens signed a note in Ford's favor in the amount of $25,000. On March 20, 1972, Carstens borrowed an additional $10,000 from Ford in a similar manner. In the process of consummating this second transaction Ford again determined the selling price of Real Eight stock and in reliance thereon, signed a note to the bank in the amount of $35,000, using $25,000 to pay off the first note and advancing the difference, less the interest on the $25,000 note, to Carstens. Carstens thereupon signed a $35,000 note to Ford. In June of 1972, Carstens defaulted on the note he signed in Ford's favor and disappeared from the scene. His whereabouts remain unknown, notwithstanding diligent efforts to locate him.

In late June of 1972 Ford transferred the stock from the bank to his stockbroker with directions to sell. The stockbroker sold 2,000 shares at $5.00 per share, but the stock could not be registered or transferred due to its restricted nature, and consequently Ford had to purchase stock in the open market at the then current price of $6.50 per share to make good on his earlier sale of the non-negotiable stock. Before Ford's $35,000 note at the bank became due, he rewrote it, and in December of 1973, he paid it off.

## CONCLUSIONS OF LAW

■ The initial question presented is whether this Court has jurisdiction to decide the claim under 15 U.S.C. § 78j(b) and Rule 10b–5. After much consideration, the Court has concluded that the transaction which occurred between Carstens and Ford is not sufficiently related to the transfer of the 20,000 shares of Real Eight "founders stock" from Cannon to Carstens to fit within the "by the use of any means or instrumentality of interstate commerce" requirement.

The plaintiff has never contended that Cannon and Carstens were in league to-

gether to induce plaintiff to purchase or in any manner acquire the Real Eight stock. The thrust of the complaint is rather the failure of Cannon to indicate on the face of the stock transferred to Carstens that the stock was non-transferable and that the transfer itself to Carstens without such a legend was a deceptive practice. If Carstens were either the plaintiff or the defendant in a suit involving this transaction, clearly the jurisdictional requirement that an instrumentality of interstate commerce be involved would have been met. But Carstens is not a party to this suit and he was not an agent of Cannon in getting Ford to accept the shares as collateral. There is nothing to show that Cannon in any way used an instrumentality of interstate commerce in effecting by himself or through any agent a transaction later turning out to be deceptive.

■ The use of an instrumentality of interstate commerce, for the purpose of the Securities Exchange Act § 10(b) and Rule 10b–5, must have some connection with the transaction complained of and with the defendant's role in the transaction. A use of interstate commerce facilities totally unrelated to the defendant and the transaction could not support jurisdiction. *Boone v. Baugh,* 308 F.2d 711 (8th Cir. 1962). See also *Kerbs v. Fall River Industries, Inc.,* 502 F.2d 731 (10th Cir. 1974), in which the court upheld jurisdiction because the evidence had revealed that the two defendants had acted in concert to induce the plaintiff to enter the transaction, though only one of the defendants had used any facility of interstate commerce. No such plan has been alleged or shown to connect Carstens with Cannon in a scheme to involve Ford with Real Eight, Inc. Cf. *Levin v. Marder,* 343 F.Supp. 1050, 1056 (W.D.Pa.1972); *Gordon v. Lipoff,* 320 F.Supp. 905, 914 (W.D. Mo.1970).

■ Even assuming that the interstate commerce requirement for jurisdiction had been met, the same lack of nexus between the Cannon-Carstens transaction and the Carstens-Ford transfer leads this court to conclude that the latter transfer was not

"in connection with" the conduct of Cannon. *Sargent v. Genesco,* 492 F.2d 750 (5th Cir. 1974); *Herpich v. Wallace,* 430 F.2d 792 (5th Cir. 1970). Cf. also the discussion in *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 94 (5th Cir. 1975).

■ Furthermore, the failure of Cannon to affix a legend to his founder's stock could have amounted, at most, to negligence. S.E.C. Rule 146(h), which requires an issuer of securities of the type here involved to exercise reasonable care in their transfer, provides in pertinent part:

"Such reasonable care shall include . . . (2) Placing a legend on the certificate stating that the securities have not been registered . . . and setting forth or referring to restrictions on transferability and sale of the securities . . . ."

Although Rule 146 did not become effective until June of 1974, the aforementioned criterion of reasonable care would have been equally applicable in 1971.

■ Mere negligence, however, is not sufficient to entail liability under § 78j(b) and Rule 10b–5:

"When a statute speaks so specifically in terms of manipulation and deception, and of implementing devices and contrivances—the commonly understood terminology of intentional wrongdoing—and when its history reflects no more expansive intent, we are quite unwilling to extend the scope of the statute to negligent conduct."

*Ernst & Ernst v. Hochfelder,* —— U.S. ——, 96 S.Ct. 1375, 47 L.Ed.2d 668, (1976). Thus plaintiff could not recover even if this Court had jurisdiction and even if the Carstens-Ford transfer was "in connection with" the conduct of Cannon.

Count II of the complaint purports to set forth a claim under the warranty provisions of Article 8 of the Uniform Commercial Code, codified in Florida as § 678.8–306 Fla.Stat. More particularly, plaintiff has claimed a violation of § 8–306(2) of the Uniform Commercial Code which sets forth three specific warranties which come into operation upon transfer of a security. This

Court has jurisdiction of this claim independent of the Securities Exchange Act, § 78j(b), since diversity between the parties exists.

First, the transferor warrants that his transfer is effective and rightful. There has been no contention here that the transfer of the stock by defendant was ineffective or wrongful. Secondly, the statute provides a warranty as to the genuineness of the security and that it has not been materially altered. Again, there has been no claim that the security in this case is not genuine, or that it was altered materially.

Finally, Section 8–306(2)(c) provides that the transferor warrants that he knows no fact which might impair the validity of the security.

The evidence yields no suggestion that Cannon did not fully inform Carstens of the restricted nature of the stock; the question, however, for purposes of imposing liability under § 8–306(2)(c), is whether Cannon's omission of a legend from the stock certificate so that an ultimate purchaser whose transferor did not explain the restricted nature of the stock could invoke the provision against Cannon.

There is no case which this Court has found which directly resolves the question of the scope of the warranty under § 8–306(2)(c). Nevertheless, it is the opinion of the Court that plaintiff was not the purchaser contemplated by the statute as the one who should receive the benefit of the warranty. In other contexts, where the Code has extended a warranty beyond the immediate person having contractual or other direct commercial privity with the one sought to be held liable, the Code has specifically stated the extent of the warranty's reach: *e. g.*, §§ 2–318; 4–207(1); 4–207(2); 5–111(1); 8–312(3). Moreover, neither the statute's plain language nor the Code comment indicate an intent to protect anyone beyond the immediate transferee. Accordingly, this Court holds that plaintiff is without standing to assert a claim under § 8–306(2)(c).

In accordance with the foregoing, which constitute the Findings of Fact and Conclusions of Law in this case, it is

ORDERED that this case be and is hereby dismissed with prejudice. A separate judgment in favor of the defendant will be issued.