Rick LEITER, Plaintiff,

v.

Walter KUNTZ and Bill Pratt,
Defendants.

Civ. No. C86–849G.

United States District Court,
D. Utah,
Central Division.

Feb. 5, 1987.

R. Steven Chambers, Salt Lake City,
Utah, for plaintiff.

Julian D. Jensen, Salt Lake City, Utah,
for defendants.

MEMORANDUM DECISION
AND ORDER

J. THOMAS GREENE, District Judge.

This matter came on for hearing on December 19, 1986, on defendants' Motion to Dismiss. Plaintiff was represented by R. Steven Chambers and defendants were represented by Julian D. Jensen. Legal mem-

oranda were submitted on behalf of all parties and counsel argued the Motion extensively, after which the matter was taken under advisement. The court now being fully advised, sets forth its Memorandum Decision and Order.

## FACTUAL BACKGROUND

In August of 1984, defendants Walter Kuntz and Bill Pratt incorporated a tanning salon business as a closely held Utah corporation under the name of Totally Tan, Inc. ("Totally Tan"). The defendants were the sole shareholders and each held 5,000 shares. On February 25, 1986, defendants transferred their 10,000 collective shares of stock to the plaintiff, Rick Leiter, as part of the sale of the Totally Tan business.[1] Telephone calls were made to plaintiff during the course of negotiations for the sale of Totally Tan [2] and plaintiff received various letters from defendants' attorney, Kevin Jackson, regarding the transaction after the sale date.[3] Plaintiff signed an investment letter and a contract of sale at the closing of the transaction, but claims that he did not have an opportunity to review the documents prior to the closing because he was told that the financial records were unavailable in that the bookkeeper was preparing taxes.

Plaintiff asserts violations of §§ 5, 12(2) and 17(a) of the Federal Securities Act of 1933, and § 10(b) and Rule 10(b)5 of the Federal Securities Exchange Act of 1934, and several pendent state claims. Among other things, plaintiff alleges that defendants knowingly made false representations to him and that defendants omitted disclosure of certain material facts in connection with the sale of the Totally Tan business. Defendants have moved to dismiss the federal claims, contending that: (1) this court lacks subject matter jurisdiction because no material means or instrumentality of "interstate commerce" is present in this case; (2) plaintiff has failed to state a claim for relief under section 5 of the Securities Act of 1933, in that the sale of securities involved herein is an "exempt transaction" under section 4(1) and section 4(2) of the Act and is therefore free from registration requirements; and (3) plaintiff has failed to state a claim for relief under section 17(a) of the Securities Act of 1933, in that no private cause of action exists under section 17(a).

### 1. *Interstate Commerce*

Defendants maintain that for purposes of both the 1933 and 1934 acts interstate commerce was not used in connection with the sale of securities because all communications, whether by telephone or by mail, were merely ministerial, incidental and of a housekeeping nature, or were subsequent to the closing of the sales transaction. *See Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1046 (11th Cir.1986); *Ford v. Cannon,* 413 F.Supp. 1393 (M.D.Fla.1976).

■ The statutory language in both the 1933 and 1934 Acts requires only that the

---

**1.** This sale of the business was the first and only distribution/transfer of any stock by either the defendants or the corporation. The shares were transferred subject to a duly affixed restrictive legend and pursuant to a transfer letter in which plaintiff acknowledged the restricted nature of the stock.

**2.** By affidavit, plaintiff claims the following telephone calls were made in connection with the sale of the Totally Tan securities:

(a) On January 30, 1986, a call was placed by defendant Kuntz's mother to cancel a meeting set for that date.

(b) On February 12, 1986, defendant Kuntz called to talk about the purchase and suggested that plaintiff find a partner with whom to split the $30,000.00 obligation.

(c) On February 15, 1986, defendant Kuntz called to set up an appointment involving himself, plaintiff, and defendant Pratt.

(d) On February 19, 1986, defendant Kuntz called to inform plaintiff that since plaintiff could not pay the entire purchase price in cash, plaintiff would have to put up all of the collateral he could in order to consummate the deal.

(e) On February 25, 1986, defendant Kuntz called to reschedule the closing.

**3.** In 1986, plaintiff received four letters dated February 26, August 15, August 15 and August 26. The February 26 letter referred to a U.C.C. Financing Statement filed with the State of Utah in connection with the business sale; the other letters dealt with allegations of plaintiff's breach of the contract of sale and of plaintiff's securities law violations.

alleged use of interstate commerce be "in connection with" the sale of a security. Manifestly, conduct both before and after the sale may be operative so long as it is "in connection with" the sale of securities. In *Franklin Savings Bank v. Levy*, 406 F.Supp. 40, 42 (S.D.N.Y.1975), *rev'd on other grounds*, 551 F.2d 521 (2d Cir.1977), the district court noted that "use of the mails after the time of the primary acts may still affect the transaction" for the purpose of establishing jurisdiction. The Tenth Circuit, in *Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731 (10th Cir.1974), addressed a somewhat analogous situation involving an intrastate telephonic communication used to arrange a meeting wherein fraud in violation of § 10(b) and Rule 10b–5 allegedly occurred. The *Kerbs* court stated:

> It is not required by the statute or the rule that the manipulative or deceptive device or contrivance be a part of or actually transmitted in the mails or instrumentality of interstate commerce; it is sufficient that such a device or contrivance be employed *in connection with* the use of the instruments of interstate commerce or the mails.... [A]t least one of the meetings between Kerbs and Thompson—at which the scheme to defraud plaintiff was carried out—was arranged during the course of a telephone conversation between Kerbs and Dial.... Both intrastate and interstate telephone communications are part of an aggregate telephonic system as a whole. And as long as the instrumentality itself is an integral part of an interstate system, Congress has power, when necessary for the protection of interstate commerce, to include intrastate activities within its regulatory control. Accordingly, we hold that proof of intrastate telephonic messages in connection with the employment of deceptive devices or contrivances is sufficient to confer jurisdiction in a § 10(b) and Rule 10b–5 action.

*Id.* at 737–38 (citations omitted). *See also, Loveridge v. Dreagoux*, 678 F.2d 870, 874 (10th Cir.1982).

In the instant case the defendants admit to having used the telephone on at least one occasion to change a prescheduled face-to-face meeting. Further, it is uncontested that defendants, by and through their attorney, mailed information concerning the filing of a financing statement, one of the documents prepared or to be prepared "in connection with" the sale of securities in this case. Accordingly, the court finds that the jurisdictional prerequisite of the use of "interstate commerce" is satisfied in this case and defendants' Motion to Dismiss is denied in that regard.

### 2. Exempt Transactions Under Sections 4(1) and 4(2)

Section 5 of the 1933 Act forbids the offer or sale of unregistered securities in interstate commerce, but Section 5 does not apply if the securities are not offered or sold in a transaction by an issuer, underwriter or dealer under Section 4(1), 15 U.S.C. § 77d(1) (1982) or constitute a private offering or sale under Section 4(2), 15 U.S.C. § 77d(2) (1982).[4] It is well settled that the burden of proving that a particular transaction is exempt rests on the person asserting the exemption. *Qwinn and Co. v. SEC*, 452 F.2d 943, 945–56 (10th Cir. 1971). Moreover, the exemption(s) relied upon "must be strictly construed against the person claiming its benefit, as public policy strongly supports registration." *Id.* at 946 (*quoting Garfield v. Strain*, 320 F.2d 116, 119 (10th Cir.1963).

### a. Exemption under Section 4(1)

Plaintiff argues that defendants cannot establish as a matter of law that they are not "issuers" under Section 4(1) and therefore that exemption is unavailable to them. Section 2(4), 15 U.S.C. § 77b(4) defines an issuer as "every person who issues or proposes to issue any security...." According to that definition Totally Tan, Inc., not defendants, would be the issuer for purposes of registration. However, Section 2(11), 15 U.S.C. § 77b(11) defines "underwriter," and within that defini-

---

**4.** The court notes that no private right of action exists under section 5 of the 1933 Act and that causes of action allegedly arising from § 5 violations are properly brought under § 12(1).

tion states that "the term 'issuer' shall include ... any person directly or indirectly controlling or controlled by the issuer...." Some courts have held that under Section 2(11) a control person is an "issuer" only if a transaction is tainted as a result of an underwriter being involved under Section 2(11),[5] or if the control person acts through the corporation and causes the corporation to issue unregistered securities.[6] Also, the SEC has provided a *nonexclusive* "safe harbor" under Rule 144 wherein control persons will be "deemed not to have engaged in a distribution" and therefore come within the parameters of the Section 4(1) exemption.[7]

The Tenth Circuit seemingly has ascribed broader meaning to § 2(11). In *Andrews v. Blue*, 489 F.2d 367 (10th Cir.1973), the court interpreted the above definitional scheme within particular facts. In *Andrews* the defendants and plaintiff had entered into a joint real estate venture. The real property which was the subject of that venture was put into a corporation (Cherry Creek Drive, Inc.) in which defendants owned 100% of the stock. Thereafter Cherry Creek Drive, Inc. merged with Medic Shield Nursing Centers, Inc., forming Colorado Western Properties Corporation. At that point the defendants received a controlling interest of the merged corporation's stock and immediately issued 16,385 shares to the plaintiff in satisfaction of his

interest in the original joint venture. In analyzing the transaction the Tenth Circuit held:

> Section 2(11) of the 1933 Act provides that an issuer includes any person directly or indirectly controlling the issuer. Here defendants controlled the issuer Colorado and Western. *As a legal consequence they were issuers.* But they were also "underwriters." The shares distributed to plaintiff were first issued to the [defendants], who in name at least were the sole shareholder of Cherry Creek Drive, Inc. Under Section 2(11) of the 1933 Act they were underwriters because they received Colorado and Western shares for distribution....

*Id.* at 374 (emphasis added). The language of the court may stand for the proposition that a controlling person is an "issuer" under the securities laws and therefore such person can never take advantage of the Section 4(1) exemption. However, we do not read *Andrews v. Blue* as necessarily standing for the proposition that every time a control person sells even one share of unregistered stock a registration statement must be filed.[8] In applying *Andrews v. Blue*, we would be governed by the particular facts and circumstances. We are unable to determine here, based upon the present record, whether the sale of stock by defendants was a "distribution" of stock so that defendants should be con-

---

**5.** *See United States v. Rachal,* 473 F.2d 1338, 1342 (5th Cir.1973) ("But by its own terms this expansive enumeration of 'issuer' is only for the purpose of paragraph (11), whose subject matter is not the imposition of criminal responsibility ... but rather the definition of underwriter."); *Shaw v. United States,* 131 F.2d 476, 480 (9th Cir.1942) ("[U]nder section 2(11) ... control makes [defendant] an issuer only with reference to the transactions of an underwriter.")

**6.** *See United States v. Rachal,* 473 F.2d 1338, 1342 (5th Cir.1973) (officer of corporation was criminally responsible as an aider and abettor to the issuance of unregistered securities by the corporation); *see also Landay v. United States,* 108 F.2d 698, 704 (6th Cir.1939) ("[B]y voting their share of stock in a block [defendants] completely dominated the corporation, the acts of the corporation were their individual acts ... and they are issuers within the meaning of the statute.")

**7.** *See* Preliminary Note to Rule 144, 17 C.F.R. § 230.144. The essential purposes of Rule 144 are (1) to insure that the investor acquires adequate information through the existence of current public information; (2) to insure through a holding period that the person selling the stock has assumed the economic risk of investment rather than acted as a mere conduit for the public sale of unregistered securities; and (3) to insure that the securities are sold in such limited quantities so as not to disrupt the trading markets. *Id.*

**8.** Our view is supported by *SEC v. Horizon Energy Corp.,* No. C–81–0662C, slip op. at 18 (D.Utah April 20, 1982) wherein Judge A. Sherman Christensen held that failures to fall within the safe harbor of 144 were "technical in nature and would not be sufficient, in and of themselves, to weigh heavily on the problem of whether or not to grant injunctive relief."

sidered to be "issuers." The overall need of plaintiff to the type of information required by the securities laws to be disclosed to shareholders should be explored. Especially relevant will be the type of information disclosed by defendants and plaintiff's own knowledge and experience in the business prior to the sale.

██ Plaintiff also argues that defendants were "underwriters" under Section 2(11). The Tenth Circuit in *G. Eugene England Foundation v. First Federal Corp.*, 663 F.2d 988, 989 (10th Cir.1973) defined underwriter as "one who has purchased stock from the issuer with an intent to resell to the public." Here, there are factual issues with regard to the defendants' intent in August of 1984 when stock was issued by Totally, Tan, Inc. that must await further development. Based upon the foregoing, defendant's motion to dismiss plaintiff's registration claim under Section 4(1), 15 U.S.C. § 77d(1) is denied.

b. *Exemption under Section 4(2)*

██ Even assuming that defendants were found to be issuers under the control provision of 2(11), defendants argue that the instant transaction is exempt from registration under the private offering provision of § 4(2) of the 1933 Act, 15 U.S.C. § 77d(2) (1982). The United States Supreme Court, in *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953) noted that the purpose of disclosure is "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." The Court continued by observing that "the exemption question turns on the knowledge of the offerees." *Id.* at 126–27, 73 S.Ct. 985. The Tenth Circuit in

*Garfield v. Strain*, 320 F.2d 116 (10th Cir. 1963) gave a general outline of the factors to be considered in drawing the private/public line under Section 4(2):

> The number, amount and manner of the offering are, however, distinctly relevant, and the general criterion is whether the particular persons affected stand in need of the protection of the Act. The Act was not intended as protection for those "shown to be able to fend for themselves."

*Id.* at 119 (citing *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953)).[9] Here, defendants contend that there was only one offeree, plaintiff, who entered into the transaction for the purpose of actively operating the business and in fact he operated the business several weeks prior to the actual stock sale. Defendants argue that in those circumstances this court should find as a matter of law that the offering was private. Plaintiff has responded by filing the affidavit of plaintiff's counsel in which he states that he is aware of two other parties who accepted defendants' offer to sell Totally Tan, Inc. Plaintiff has also filed an affidavit in which he states that he did not have an opportunity to review the financial records of the company prior to the sale, and that he was aware that Totally Tan, Inc. had been listed with a business broker. Although the affidavit of plaintiff's counsel is problematic due to a potential conflict and lack of personal knowledge, plaintiff's affidavit does raise issues of fact with regard to whether a public offering was made. Accordingly, plaintiff should be allowed to engage in discovery on that issue. Defendants' motion to dismiss based on Section 4(2) is denied at this time.[10]

**9.** *See also Doran v. Petroleum Management Co.*, 545 F.2d 893, 899 (5th Cir.1977), wherein the Fifth Circuit articulated the following factors to be considered in resolving questions of exemption:

> The relevant factors include the number of offerees and their relationship to each other and the issuer, the number of units offered, the size of the offering, and the manner of the offering. Consideration of these factors need not exhaust the inquiry, nor is one factor's weighing heavily in favor of the private status of the offering sufficient to ensure the avail-

ability of the exemption. Rather, these factors serve as guideposts to the court in attempting to determine whether subjecting the offering to registration requirements would further the purposes of the 1933 Act.

**10.** This court also encourages the parties to brief the issue of whether the exemption under Section 3(a)(11), 15 U.S.C. § 77c(a)(11) applies to this case. Although Rule 147 is the S.E.C. safe harbor implementing 3(a)(11), the requisites of the 1933 Act may be met even if Rule 147 is not. *See Busch v. Carpenter*, 598 F.Supp. 519

*3. Section 17(a) Implied Right of Action*

■ Plaintiff's Third Cause of Action alleges fraud in the sale of a security under section 17(a) of the 1933 Act. 15 U.S.C. § 77q. Since the statutory language of § 17(a) is similar in many respects to § 10(b) and Rule 10b–5 of the 1934 Act, and given the judicially recognized private cause of action under 10(b) and Rule 10b–5, some courts have held that a private cause of action exists under § 17(a). *See Stephenson v. Calpine & Conifers II, Ltd.,* 652 F.2d 808 (9th Cir.1981). The United States Supreme Court has withheld ruling on this issue. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 734 n. 6, 95 S.Ct. 1917, 1924 n. 6, 44 L.Ed.2d 539 (1975). Likewise the Tenth Circuit has not directly decided whether an implied right of action under § 17(a) exists. The matter was addressed in *State of Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687 (10th Cir.1981) wherein the court expressed the following dicta:

> [T]here is considerable doubt as to whether a private right of action exists under § 17(a) of the 1933 Act. See *Woods v. Homes & Structures of Pittsburg, Kansas,* 489 F.Supp. 1270, 1284–88 (D.Kan.1980), where the court reviewed conflicting authorities in detail and came to the conclusion that no private action exists. The Supreme Court has not yet resolved the issue. *See Aaron v. Securities Exchange Commission,* 446 U.S. 680, 689, 100 S.Ct. 1945, 1951, 64 L.Ed.2d 611 (1980). Our decision today with respect to § 10(b) of the 1934 Act would apply equally to § 17(a) of the 1933 Act, if a private cause of action were assumed to exist under the latter statute.

*Id.* at 689 n. 1. *See also In re Storage Technology Corp. Securities Litigation,* 630 F.Supp. 1072, 1079 (D.Colo.1986).

This court has refused to find an implied right of action under § 17(a) of the 1933 Act. In *Noland v. Pickett,* C80–0034W slip op. (February 12, 1982), Honorable David K. Winder specifically granted a motion to dismiss a claimed cause of action under § 17(a) of the 1933 Act. After a short discussion of legislative intent under the 1933 Act, Judge Winder concluded:

> There is nothing on the face of section 17(a) indicating a private right of action for damages, or creating a benefit for an "especial" class of persons. Compare *Cannon v. University of Chicago,* 441 U.S. 677, 689–94 [99 S.Ct. 1946, 1953–56, 60 L.Ed.2d 560] (1979), *with Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18–19 [100 S.Ct. 242, 246–47, 62 L.Ed.2d 146] (1979). Nor is there any indication in the legislative history evidencing such an intent; on the contrary, every indication is that private damages were not intended. *See SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 867 (2d Cir.1968) (Friendly, J., concurring); *McFarland v. Memorex Corp.,* 493 F.Supp. 631, 652 (N.D.Cal.1980). Therefore the court can only conclude that no private right of action for damages arises under section 17(a) of the 1933 Act. . . .

*Id.* at 3–4; *see also Omicron Indus. v. Ihlenburg,* C83–1290W slip op. at 2–3 (July 22, 1986) (no private right of action under § 17(a)). We are similarly persuaded that no private right of action exists under § 17(a) of the 1933 Act. Accordingly, defendants' Motion to Dismiss plaintiff's third cause of action is granted.

This Memorandum Decision and Order will suffice as the court's final action on this motion; no further Order need be prepared by counsel.

---

(D. Utah 1984); Bennett, *The Proposed Federal Securities Code: "Local Distributions,"* Utah Bar Journal Winter 1979, Summer 1980. Accordingly, if the securities in this case were exempt under 3(a)(11) then even a subsequent sale of those securities would be exempt. *See* Bennett, *supra* at 5 n. 7.